133 S.W.3d 1 (2004)
In the Interest of K.A.W. and K.A.W.
No. SC 85683.
Supreme Court of Missouri, En Banc.
March 30, 2004.
Rehearing Denied May 25, 2004.
*5 Chris E. Rollins, Kayla Vaughan, St. Louis, Mark H. Kruger, Clayton, for Appellant.
Jeremiah W. (Jay) Nixon, Atty. Gen., Gary L. Gardner, Asst. Atty. Gen., Jefferson City, Bryan L. Hettenbach, Town & Country, Karen A. Dill, Donna L. Head, Susan C. Guerra, R. Jeff Childress, Division of Legal Services, St. Louis, Bernhardt W. Klippel, III, Clayton, for Respondent.
RICHARD B. TEITELMAN, Judge.

I. Introduction and jurisdiction
K.A.W. and K.A.W. (twins) are minor children born to T.W. ("Mother"). Mother's parental rights were terminated on December 11, 2002, pursuant to section 211.447,[1] and she appeals.[2] Mother argues that the trial court's findings with respect to sections 211.447.4(2), (3) and (6) and 211.447.6 were insufficient. She also contends that the trial court erred because it failed to make required findings.
This case was transferred to this Court prior to disposition by the court of appeals because of this Court's desire to resolve this case forthwith in accordance with the admonition of section 453.011.1 that cases involving termination of parental rights and adoption be given priority.[3]
The judgment is reversed, and the cause is remanded. If further proceedings include the termination of Mother's parental rights, the trial court is directed to consider and make findings on each of the statutorily required subdivisions or factors for all grounds for termination of parental *6 rights on which the trial court bases its decision.

II. Facts
When Mother was pregnant with the twins she was already raising three other young children on her own while trying to hold a job. Overwhelmed, she struggled with the question of whether it was best to place her twins up for adoption. Eventually, Mother decided that she should place them up for adoption because, as she later testified, she wanted them "to have a better life."
The twin girls were born in June 2000, approximately three months premature. They required a two-month hospital stay. Although Mother had decided to place her twins for adoption, she did not abandon them. Rather, she visited the twins in the hospital daily and continued caring for them, holding, feeding and talking to them. Mother expressed breastmilk for their best care rather than allowing them to be fed formula. She took a special class to learn more about how to care for her premature twins. When the twins were released from the hospital, Mother woke hourly to feed and administer medicine to them, while still maintaining her obligations to her other children and her job.
While caring for her children, Mother carefully tried to investigate prospective families that might be suitable for the twins. She obtained the help of adoption professionals and attorneys. She expressed interest in an "open adoption" so that she could maintain contact with the twins and continue to support them. Mother was told she would need to look beyond Missouri, which does not allow "open adoption."[4]
An adoption facilitator presented a prospective family from California. Mother visited the couple for 10 days to be sure they were fit. Later, Mother became convinced that the California couple was not as good a placement as she originally believed (among other things, they were becoming reluctant to maintain contact), so when she was in California for a visit, she retained the twins in her custody and began to seek another placement. Mother was advised that a British couple was still interested in adopting her babies. Mother had previously investigated the couple and believed them to be excellent candidates. The husband was an attorney, and the couple supported doing an open adoption. The British couple came to California, and the twins, Mother and the couple traveled a circuitous route from California to Arkansas by car. Mother was counseled by a British social worker and three attorneys that she should complete the adoption there because open adoption was not permitted in Missouri. Mother was advised to claim that she was an Arkansas resident. She refused, but she did provide an Arkansas address that belonged to a relative. An Arkansas judge approved the adoption.
Eventually, British officials determined that the British couple was unfit. The twins were taken into the custody of a British children's services agency. The Arkansas court entered an order setting aside the adoption decree for lack of jurisdiction because none of the parties were Arkansas residents. The twins were returned to Missouri, where they were placed in the custody of the Missouri division of family services (DFS).
*7 When Mother learned that the second adoption effort had failed, she decided that adoption was not the appropriate option, and she resolved to rear the babies herself and rally the support of her family so that she could do it well.[5]
The record indicates that, once DFS gained jurisdiction of the twins, Mother's equivocation ceased other than a few week period shortly after DFS took jurisdiction, when she considered allowing the foster parents to adopt the children but ultimately rejected that alternative and strove to gain back custody of the twins instead. After DFS gained jurisdiction of the twins, there is no evidence that any of Mother's conduct would indicate a likelihood of future problems. Instead, all of the evidence indicates that Mother remedied every potential problem noted by DFS. She complied fully with DFS's entire parenting plan, which had as its ostensible goal reunification:
 The plan required Mother to take parenting classes. Mother took parenting classes, and her instructor testified that Mother was the most involved and participatory member of the class.
 The plan required Mother to visit the twins regularly. Mother visited the twins as often as the court would allow and fought for the right to visit more frequently.
 The plan required Mother to provide financial support for the twins. Mother did so and frequently paid in advance.
 Mother was required to undergo a psychological examination, and she did so willingly. On her own initiative, she also obtained counseling.
 She submitted to drug screenings (which she passed) although there was no allegation of drug use.
A DFS worker later testified that Mother complied with everything that had been asked of her including every element of the plan. Nevertheless, the juvenile officer filed a petition to terminate Mother's parental rights. The petition alleged that termination was warranted according to sections 211.447.4(2), (3) and (6) and that termination was in the twins' best interests.

III. Trial court's findings, conclusions and judgment
The trial court conducted a hearing and issued "Findings, Conclusions and Judgment Terminating Parental Rights." The trial court's findings incorporated its earlier "Findings and Judgment of Disposition" and "Permanency Planning Order." The trial court terminated Mother's parental rights under subdivisions (2), (3) and (6) of section 211.447.4, ruling:
15.... "Mother" has abused and neglected "The Twins". Section 211.447.4(2), RSMo.
(a) "Mother" has committed severe and recurrent acts of emotional abuse toward "The Twins." Section 211.447.4(2)(c), RSMo. These acts include the multiple, unstable, inappropriate, temporary placements including, but not limited to, placements in California, Arkansas, and Great Britain within a span of a few months during the first months of "The Twins" lives....

*8 16.... [T]he conditions which caused this Court to assume jurisdiction over "The Twins" or conditions of a potentially harmful nature continue to exist and will not be remedied at an early date to permit return of "The Twins" in the near future to the custody of "Mother", and under all the circumstances, continuation of any relationship between the "Mother" and "The Twins" greatly diminishes the prospects of "The Twins" for early integration into a stable and permanent home. Section 211.447.4(3), RSMo. These conditions include, but are not limited to, the multiple placements of "The Twins" during the first months of their lives and the resulting instability; "Mother's" continued stress and being overwhelmed with the reality of The Twins; the continued indecisiveness of "Mother" in dealing with "The Twins"; and the lack of family support for "Mother" in caring for the needs of "The Twins." Additionally, further movement of "The Twins" from the stability of their environment since April 18, 2001, would be harmful to "The Twins" in light of the Reactive Detachment [sic] Disorder in Partial Remission, a major mental disorder, suffered by "The Twins" as a result of the multiple placements and resulting instability....
17..... "Mother" is unfit to be a party to the parent-child relationship with "The Twins" because of her consistent pattern of emotional abuse and, additionally, because of specific conditions directly relating to her relationship with "The Twins", all of which are of a duration and nature rendering "Mother" unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental and emotional needs of "The Twins". Section 211.447.4(6), RSMo. These considerations include, but are not limited to, "Mother's" continued indecisiveness in dealing with the lives of "The Twins" and their welfare; and the lack of family support for "Mother" in caring for health and welfare of "The Twins"....
...
19.... [T]here are no emotional ties between "The Twins" and "Mother". This is a direct result of the actions of "Mother" in her multiple placements of "The Twins" and resulting instability and emotional harm suffered by "The Twins". Section 211.447.6(1), RSMo.
20.... "The Twins" are not bonded with "Mother". This is a direct result of the deliberate acts of "Mother", who knew or should have known said acts would subject "The Twins" to a substantial and real risk of physical and mental harm. Section 211.447.6(7), RSMo.
...
22. The multiple placements and instability of "Mother" have caused emotional harm to "The Twins", and these actions by "Mother" continue to affect "The Twins" to this day, and "Mother" is unwilling or unable to provide "The Twins" with the stability necessary for their overall welfare.
23. Termination of the parental rights of "Mother" is necessary to serve the best interests of "The Twins", in light of all the evidence, and ... the evidence supporting termination of the parental rights of "Mother" is clear, cogent and convincing. Section 211.447.5, RSMo.
...
25. This Court has considered all subsections of Section 211.447.4 and Section 211.447.6, RSMo, and except as expressly provided herein, finds the subsections irrelevant because there was inadequate evidence of their applicability presented during the evidentiary hearing.
...

*9 27. The parental rights of "Mother"... with "The Twins" ... shall be, and hereby are, terminated.
Mother appeals, arguing that the trial court's findings with respect to sections 211.447.4(2), (3) and (6) and 211.447.6 were insufficient. She also contends that the trial court erred because it failed to make required findings.

IV. Termination of parental rights
"Courts typically terminate parental rights under a `parental fault' standard, in which the court focuses on the behavior of the parent or parents, a `best interests of the child' standard, in which the court focuses on the effect of termination of parental rights on the child, or a combination of both." 2 Am Jur 2d Adoption sec. 134 (2003). Missouri, through section 211.447, terminates parental rights under a combination of both standards. Additionally, section 211.443 provides that Missouri uses a rule of construction for section 211.447, that it:
[S]hall be construed so as to promote the best interests and welfare of the child as determined by the juvenile court in consideration of the following:
(1) The recognition and protection of the constitutional rights of all parties in the proceedings;
(2) The recognition and protection of the birth family relationship when possible and appropriate; and
(3) The entitlement of every child to a permanent and stable home.
Sections 211.447.2, 211.447.3 and 211.447.4 provide the various grounds for a termination of parental rights. A trial court must find the existence of at least one ground and that the termination of parental rights is in the child's best interests. Sec. 211.447.5; In the Interest of E.L.B., 103 S.W.3d 774, 776 (Mo. banc 2003). The state bears the burden of proof, which must be met by the presentation of substantial evidenceevidence that, if true, has probative force upon the issues. In the Interest of B.C.K. and K.S.P., 103 S.W.3d 319, 322 (Mo.App.2003).

A. Future harm
An essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking to the future, the child would be harmed by a continued relationship with the parent. A prospective analysis is required to determine whether grounds exist and what is in the best interests of the child for the reasonably foreseeable future. Obviously, it is difficult to predict the future. Section 211.447 provides for detailed consideration of the parent's past conduct as well as the parent's conduct following the trial court's assumption of jurisdiction as good evidence of future behavior. In the Interest of M.E.W., 729 S.W.2d 194, 196 (Mo. banc 1987) (court needs to consider existing conditions, which may have arisen or were discovered after it assumed jurisdiction); In the Interest of C.L.W., 115 S.W.3d 354, 356 (Mo.App.2003) (court must look at totality of parent's conduct both prior to and after filing of termination petition); In the Interest of S.H., 915 S.W.2d 399, 404-5 (Mo.App.1996) (past patterns provide vital clues to present and future conduct).
However, it is insufficient merely to point to past acts, note that they resulted in abuse or neglect and then terminate parental rights. In the Interest of C.L.W., 115 S.W.3d at 356. Past behavior can support grounds for termination, but only if it is convincingly linked to predicted *10 future behavior.[6] There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm. In the Interest of L.G., 764 S.W.2d 89, 95 (Mo. banc 1989) (state met its burden by proving likely harm to child would occur in future). "A judge may properly be guided by evidence demonstrating reason to believe that a parent will correct a condition or weakness that currently disables the parent from serving his or her child's best interests." 2 Am Jur 2d Adoption sec. 135 (2003).
Courts have required that abuse or neglect sufficient to support termination under section 211.447.4(2) be based on conduct at the time of termination, not just at the time jurisdiction was initially taken. In the Interest of B.C.K. and K.S.P., 103 S.W.3d at 328; In the Interest of T.A.S., 32 S.W.3d 804, 812 (Mo. App.2000) (T.A.S. I). Similarly, courts have required that a failure to rectify sufficient to support termination under section 211.447.4(3) be based on a determination that conditions of a potentially harmful nature continued to exist as of the termination, rather than a mere finding that conditions that led to the assumption of jurisdiction still persisted. In the Interest of T.A.S., 62 S.W.3d 650, 656-7 (Mo.App. 2001) (T.A.S. II). Section 211.447.4(6) explicitly requires analysis of the "reasonably foreseeable future." In the Interest of C.W. and S.J.W., 64 S.W.3d 321, 325 (Mo.App.2001). Findings supporting earlier determinations are not irrelevant, but they must be updated to address the extent to which they describe the time of the termination and the potential for future harm. T.A.S. I at 812; T.A.S. II at 656-7. To that end, a trial court cannot support a termination by merely incorporating earlier findings supporting its assumption of jurisdiction or some other earlier disposition.

B. Parenting, social services, reunification or treatment plan
Whether it has been created following a court order or on the independent initiative of DFS, a parenting, social services, reunification or treatment plan can provide a trial court with highly relevant evidence. A parent's efforts to comply with such a plan will provide the court with an indication of the parent's likely efforts in the future to care for the child. In the Interest of B.C.K. and K.S.P., 103 S.W.3d at 328-9. A lack of effort to comply with a plan, or a lack of success despite effort, can predict future problems. In the Interest of C.L.W., 115 S.W.3d at 360. Such evidence cannot be irrelevant. While a plan is no longer mandatory, if one exists, it is error for a trial court to ignore it when considering termination of parental rights. In the Interest of A.S.O., 52 S.W.3d 59, 66 (Mo.App.2001) (purpose is to ensure that all reasonable means to help the parent remedy the adverse conditions were utilized to no avail); T.A.S. I at 813.

C. Impact on child
Another essential part of any determination whether to terminate parental rights is whether the cited conduct of the parent has had or will have a detrimental *11 impact upon the child. In the Interest of P.C., B.M., and C.M., 62 S.W.3d 600, 604 (Mo.App.2001) (the trial court must hear some evidence describing what impact the questioned conduct has had on the children). Poor conduct or character flaws are not relevant unless they could actually result in future harm to the child. For example, sections 211.447.4(2)(a) and 211.447.4(3)(c) provide that the parent's mental condition is a factor supporting termination only if it "renders the parent unable to knowingly provide the child the necessary care, custody and control."

D. Severity of acts or conditions
Another essential part of any determination whether to terminate parental rights is whether the cited acts or conditions of the parent, and their accompanying impact upon the child, are severe enough to constitute abuse or neglect. In the Interest of P.C., B.M., and C.M., 62 S.W.3d at 604 (parent's acts may have been inappropriate but were not severe enough to support termination). Some parental conduct will harm a child without constituting abuse or neglect. In the Interest of B.C.K. and K.S.P., 103 S.W.3d at 328. It is essential that the trial court determine whether the parent's acts are of sufficient severity.
For some types of parenting problems, the required level of severity the court must find is specified by the statute. For example, sections 211.447.4(2)(b) and 211.447.4(3)(d) provide that chemical dependency is of sufficient severity to support termination if it "prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control." For another example, not every criminal act committed by the parent is severe enough to be abuse or neglect. Section 211.447.4(4) provides that it will be a grounds for termination of parental rights if the "parent has been found guilty or pled guilty to a felony violation of chapter 566, RSMo [sexual offenses], when the child or any child in the family was a victim, or a violation of section 568.020, RSMo [incest], when the child or any child in the family was a victim." Section 211.447.6(6) provides for consideration of the "conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years...." These sections provide guidance as to how severe a parent's criminal conduct must be to constitute abuse.[7]
Isolated abusive acts or conditions may not support termination when considered individually, but if they form a consistent pattern, are recurrent or are repeated, they can, when considered in combination, rise to the level of abuse and support termination. Sec. 211.447.4(2)(c), (2)(d), (3), (6).

V. Standard of review
In termination of parental rights cases, appellate courts defer to the trial court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law. In the Interest of M.E.W., 729 S.W.2d 194, 195-6 (Mo. banc 1987). Appellate courts *12 should review conflicting evidence in the light most favorable to the judgment of the trial court. Id.
Appellate courts must review whether the grounds for termination were supported by "clear, cogent and convincing evidence." Sec. 211.447.5; In the Interest of C.L.W., 115 S.W.3d at 355. In this context, clear, cogent and convincing evidence instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true. Id.
The constitutional implications of a termination of parental rights also inform the standard of appellate review. The bond between parent and child is a fundamental societal relationship. In re Parental Rights to Q.L.R., 118 Nev. 602, 54 P.3d 56, 58 (Nev.2002); see Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); see also Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). A parent's right to raise her children is a fundamental liberty interest protected by the constitutional guarantee of due process. It is one of the oldest fundamental liberty interests recognized by the United States Supreme Court. Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The fundamental liberty interest of natural parents in raising their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State. Santosky v. Kramer, 455 U.S. at 753, 102 S.Ct. 1388; In the Interest of M.D.R., 124 S.W.3d 469, 472 (Mo. banc 2004). Those faced with forced dissolution of their parental rights have a more critical need for protections than do those resisting state intervention into ongoing family affairs. Id. The termination of parental rights has been characterized as tantamount to a "civil death penalty." In re N.R.C., 94 S.W.3d 799, 811 (Tex.App.-Houston [14th Dist.] 2002); In re Parental Rights as to K.D.L., 118 Nev. 737, 58 P.3d 181, 186 (2002). "It is a drastic intrusion into the sacred parent-child relationship." In the Interest of P.C., B.M., and C.M., 62 S.W.3d at 603.
Consequently, when reviewing a trial court's termination of parental rights, appellate courts must examine the trial court's findings of fact and conclusions of law closely. Id. Statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship. In re Adoption of W.B.L., 681 S.W.2d 452, 455 (Mo. banc 1984); 43 C.J.S. Infants sec. 40(a) (2003).

VI. Trial court's findings
The trial court relied upon several specific acts and conditions of Mother in support of the grounds for termination. Each one must be supported by clear, cogent and convincing evidence and will be analyzed for: whether there was sufficient reason to believe that it had an impact upon the twins, whether it was severe enough to constitute abuse or neglect and whether it provides an indication of the likelihood of future harm to the twins.

A. Placements for adoption
The trial court found that Mother's acts included "multiple, unstable, inappropriate, temporary placements including, but not limited to, placements in California, Arkansas, and Great Britain within a span of a few months during the first months of `The Twins' lives."
There is no dispute that Mother twice attempted to place her twins for adoption. However, the record does not contain evidence that the first placement in California *13 was unstable or inappropriate. The "placements in ... Arkansas and Great Britain" refer to the single attempted adoption of the twins in Arkansas by the couple from Great Britain and, thus, constitute but one placement.
The two attempts at placement of the twins for adoption may have been mistakes, and may even have harmed the twins, but no reported Missouri case has ever held that placing a child up for adoption more than once rises to the level of abuse, and there is no reason to consider it abuse in this case. Mother's two attempts at placing her twins for adoption are not an indication of potential future harm to the twins, especially without evidence that she would try to again place the twins for adoption if she regains custody of them. There is no evidence in the record that Mother intends to do anything other than regain permanent custody of her twins.
The trial court erred in concluding that these placements support findings that Mother committed "severe and recurrent acts of emotional abuse" and that Mother created "conditions of a potentially harmful nature [that] continue to exist and will not be remedied at an early date." There is no evidence that the placements were abusive or that they indicate a likelihood of future harm. Therefore, they do not constitute evidence that "instantly tilts the scales in favor of termination." T.A.S. II at 655.

B. Mother's "continued stress," "being overwhelmed with the reality of the twins" and "continued indecisiveness"
The trial court found that Mother suffered from "continued stress and being overwhelmed with the reality of The Twins," and "continued indecisiveness ... in dealing with `The Twins.'"
Mother's mental state cannot constitute abuse unless it rises to the level described by sections 211.447.4(2)(a) and (3)(c): "[a] mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control."[8]In the Interest of C.L.W., 115 S.W.3d at 360-1 (Prewitt, J., dissenting); Mark Hardin and Robert Lancour, Early Termination of Parental Rights: Developing Appropriate Statutory Grounds, 14 (1996) (more required than just presence of mental or emotional disabilityincapacity must be so severe that parent is incapable of providing minimally acceptable care).
It is hard to imagine a single working mother of five children living in poverty without enormous stress. Feeling overwhelmed in this context is not an indication of emotional instability, nor is it child abuse; rather, it is normal. DFS hired an expert to evaluate Mother's mental ability to care for her children. The expert found *14 that Mother's "difficulties in parenting are not substantially different from those of many other single parents caring for large families ..., she appears to be an adequate parent, and there is no evidence that her parental rights should be terminated."
Sections 211.447.4(2)(a) and 211.447.4(3)(c) provide that a mental or emotional condition must be analyzed in three prongs to make an adequate finding: (1) documentationwhether the condition is supported by competent evidence; (2) durationwhether the condition is permanent or such that there is no reasonable likelihood that it can be reversed; and (3) severity of effectwhether the condition is so severe as to render the parent unable to knowingly provide the child necessary care, custody and control.
Considering each of these three prongs, the problems cited by the trial court (stress, feeling overwhelmed and indecisiveness) do not support termination of parental rights. The expert evidence as to Mother's mental state did not constitute competent evidence that these problems were abnormal. These problems were situational and not necessarily permanent; therefore, the importance of the parenting or reunification plan and the services provided by DFS to Mother. There is evidence that Mother complied with the plan and that the services helped. The trial court's use of the word "continued" is without any support in the record. Even if there was reason to believe that these problems "continued," there is no evidence in the record that such a combination of problems ever caused abuse or would cause future harm. The only evidence on this question was provided by the DFS expert who concluded that these reactions were expectable and not a potential cause of future harm.
Therefore, these findings do not support the termination of Mother's parental rights.

C. Reactive Attachment Disorder
The trial court found that the twins suffered from "Reactive Detachment Disorder in Partial Remission, a major mental disorder, suffered by `The Twins' as a result of the multiple placements and resulting instability." This opinion was rendered by only one of the several physicians who evaluated the twinsDr. Luby. Dr. Luby actually diagnosed the twins with Reactive Attachment Disorder in Partial Remission. The trial court also omitted a modifier used by Dr. Luby: "moderate" (Dr. Luby testified that the condition can be severe, moderate or mild). Dr. Luby asked to be allowed to see the twins interact with Mother, but the request was deniedsignificantly undermining the reliability of the diagnosis. The two experts who evaluated the twins in the presence of Mother did not agree with Dr. Luby's diagnosis.
Furthermore, Dr. Luby acknowledged that she did not document any of the standard diagnostic criteria for Reactive Attachment Disorder. Even DFS showed little confidence in Dr. Luby's assessment. DFS did not arrange for treatment and did not inform the foster parents of the diagnosis. Moreover, despite the diagnosis, even Dr. Luby acknowledged that she could see no harm in placing the twins back with Mother.
The two psychologists who evaluated the twins and witnessed their interaction with Mother strongly disagreed with Dr. Luby's diagnosis. Dr. Dean Rosen, a clinical psychologist, found that the twins were comfortable with Mother, paying little or no attention to others when their mother was in the room. He observed no signs of Reactive Attachment Disorder. Dr. Rosen found a "good indication there was a bond *15 with [their] mother" and that Mother demonstrated appropriate parenting skills. Dr. Rosen testified that there would be no harm in returning the twins to their mother.
Dr. Daniel Cuneo, a clinical psychologist, was also allowed to observe the twins with their mother. He concluded that the twins showed no signs of Reactive Attachment Disorder. He found that the twins played with and appropriately modeled their mother's behavior, that the children were comfortable and that Mother set limits for the twins while showing affection toward them. Dr. Cuneo observed that the twins showed affection for their mother. He also found no reason to expect the twins to be harmed by being returned to their mother.
A primary focus of a proceeding to terminate parental rights is the relationship between the parent and the child. The findings of experts who have had the opportunity to observe and evaluate that relationship should be given great weight.
The trial court's finding that the twins suffer from "Reactive Detachment [sic] Disorder in Partial Remission, a major mental disorder" that would be worsened by their being placed in Mother's custody, is not supported by clear, cogent and convincing evidence. The evidence only supports a conclusion that the twins may have been emotionally harmed by having been placed multiple times, but that such harm has been ameliorated and that the continuation of Mother's parental rights does not pose a threat of future harm. Therefore, this finding does not support a termination of Mother's parental rights.

D. Lack of family support
The trial court found a "lack of family support for `Mother' in caring for the needs of `The Twins.'"
A lack of extended family support cannot support a termination of Mother's parental rights without specific evidence that the lack of such support renders Mother unable to care for her children. While the evidence as to how much support Mother can expect to receive from extended family is contested, there is no evidence that the support Mother will receive will be any different than the support she received for her other children.
There is evidence that, with substantial help from her extended family, Mother has reared her other children in a loving, supportive environment, free from abuse or neglect. For example, despite financial hardship and inconvenience, Mother placed one of her children in a private school more than 25 miles away from her home because she thought it best for that child. A school official there described Mother as a very engaged and interested parent who gave more to the school than many of the school's two parent families. For her other children, Mother received help from family to register the other children for school in Ladue, Missouri, because it is reputed to be an excellent district. Mother and her family also tend to the children's extra-curricular interests by arranging for them to participate in soccer, swimming, gymnastics, cub scouts, fishing and camping.
The trial court's finding of a lack of family support is not supported by clear, cogent and convincing evidence. Even if it were, a lack of family support is not evidence that instantly tilts the scales in favor of termination without additional evidence as to the necessity of the family support. Therefore, this finding does not support termination of Mother's parental rights.

E. Lack of emotional ties and bonding between the twins and Mother
The trial court found that "there are no emotional ties" between the twins *16 and Mother and that the twins "are not bonded" with Mother. However, the trial court failed to cite any support for the alleged lack of emotional ties or bonding, which is not supported by the testimony of any of the experts who observed Mother interact with the twins. This finding is not supported by clear, cogent and convincing evidence and does not support a termination of Mother's parental rights.

F. Findings considered in combination
Individually, none of the above findings supports the termination of Mother's parental rights. They also fail to describe a consistent pattern, nor are they recurrent or repeated. Therefore, they do not support termination when considered in combination.

VII. Grounds for termination
The trial court terminated Mother's parental rights under subdivisions (2), (3) and (6) of section 211.447.4. The trial court's judgment must be affirmed if termination is supported under any of the three subdivisions and termination was in the best interests of the twins. In the Interest of E.L.B., 103 S.W.3d at 776; In the Interest of C.L.W., 115 S.W.3d at 356.

A. Section 211.447.4(2)
Section 211.447.4(2) provides for termination of parental rights if:
The child has been abused or neglected. In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;
(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or
(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development;
The trial court concluded that it had considered all applicable subdivisions or factors and omitted those it determined to be irrelevant or supported by inadequate evidence of applicability. Section 211.447 does not provide the trial court with such discretion. In the Interest of L.G., 764 S.W.2d 89, 94 (Mo. banc 1989). "The court is required to make specific findings on each of these four factors [or subdivisions]. If a factor is not relevant to the case, the court should state why the given factor is not relevant." T.A.S. I at 810 (emphasis in original); In the Interest of B.C.K. and K.S.P., 103 S.W.3d at 327 (trial court must consider and make findings on four factors). "Strict and literal compliance with the statutory requirements is necessary in termination of parental rights cases." T.A.S. I. "Statutory *17 mandates to make findings may not be overlooked on appeal." In re A.P., 988 S.W.2d 59, 62 (Mo.App.1999). Section 211.447.4(2) provides that the trial court "shall consider and make findings" on all four factors, (a) through (d). Yet, the trial court only considered factor (c).
As to factor (c), the trial court's finding that Mother "has committed severe and recurrent acts of emotional abuse toward `The Twins'" by placing the twins with two families within a span of a few months is not sufficient, as discussed above.
As to factors (a), (b) and (d), the evidence indicates that, rather than being irrelevant or unsupported, many of the omitted findings would have supported Mother's claims. There is no question that Mother has neither a mental condition nor chemical dependency that would preclude her from having custody of her children. Therefore, factors (a) and (b) favor Mother. Factor (d) also strongly favors Mother, in that she has continuously (even when the children were in DFS custody and foster care) provided the twins with monetary and emotional support.
Therefore, the trial court's findings as to section 211.447.4(2) are either absent or insufficient, and the trial court's reliance upon section 211.447.4(2) as grounds for termination is error.

B. Section 211.447.4(3)
Section 211.447.4(3) provides for termination of parental rights if:
The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]
There was no evidence in the record that the conditions that led to the assumption of jurisdiction of the twins still persisted at the time of the termination Mother was not attempting, and there was no evidence she would attempt, to find new adoptive parents for the children.
Neither was there any showing that conditions of a potentially harmful nature continued to exist, that there was little likelihood that those conditions would be remedied at an early date so that the *18 children could be returned to the parent in the near future, or that the continuation of the parent-child relationship would greatly diminish the twins' prospects for early integration into a stable and permanent home. To the contrary, the record showed that Mother fully complied with all aspects of the parenting plan and that she had arranged for the care of the twins and had appropriately cared for her other children and was ready to take custody of the twins immediately.
Neither is there evidence that the trial court considered the factors (a)-(d), although these factors are specifically required to be considered in order to terminate under section 211.447.4(3). Instead, the court ignored factors (a), (b) and (d), all of which supported Mother retaining parental rights, and focused solely on factor (c).
In finding that factor (c) weighed in favor of termination, the trial court cited the placements for adoption, Mother's stress and being overwhelmed, Mother's indecisiveness, lack of family support and the twins' Reactive Attachment Disorder. As discussed above, whether considered individually or in combination, these findings do not support termination.
Further, had the trial court considered factors (a), (b) and (d) as it must, the current record indicates they would have weighed heavily against termination. In the Interest of A.S.O., 52 S.W.3d at 66. Mother has been exceptionally compliant with the parenting or social service plan. Sec. 211.447.4(3)(a). Although compliance with a plan should be of paramount importance (as discussed above), Mother's efforts were labeled as "irrelevant" by the trial court. And, given the evidence in the present record, "the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting [her] circumstances or conduct to provide a proper home" have been more a "success" than a "failure." Sec. 211.447.4(3)(b). Finally, there is no contention that Mother has any chemical dependency. Sec. 211.447.4(3)(d).
Therefore, the trial court's findings as to section 211.447.4(3) are either absent or insufficient, and the trial court's reliance upon section 211.447.4(3) as grounds for termination is error.

C. Additional findings as to best interests required for termination under sections 211.447.4(2) and (3)
Section 211.447.6 provides the following factors that are relevant to determining whether termination is in a child's "best interests":
When considering whether to terminate the parent-child relationship pursuant to subsection 2 or 3 of this section or subdivision (1), (2), (3) or (4) of subsection 4 of this section, the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case:
(1) The emotional ties to the birth parent;
(2) The extent to which the parent has maintained regular visitation or other contact with the child;
(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;
(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
(5) The parent's disinterest in or lack of commitment to the child;

*19 (6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.
The trial court concluded that any findings that did not favor termination were not important. The trial court therefore made findings as to factors (1) and (7) only, finding that "there are no emotional ties between `The Twins' and `Mother'" and that this is a direct result of the deliberate acts of Mother and that the twins "are not bonded" with Mother, "who knew or should have known said acts would subject `The Twins' to a substantial and real risk of physical and mental harm." As discussed above, these findings are not supported by clear, cogent and convincing evidence.
The trial court also misapplied factor (7). It requires consideration of "[d]eliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm." The phrase "of which the parent knew or should have known" modifies "acts of another." As applied to this case, factor (7) can be phrased as requiring consideration of deliberate acts of Mother that subjects the twins to a substantial risk of physical or mental harm. The usage of "subjects" rather than "subjected" underscores the importance of considering the future. The trial court merely cited Mother's past acts (i.e., the attempts to place the twins for adoption) and concluded that those acts were abusive. The trial court failed to describe how those past acts indicate a future risk of harm to the twins.
The trial court made no other findings under section 211.447.6, specifically stating that it found all omitted factors "irrelevant." That is incorrect. The goal of a termination hearing is not to justify termination, but to determine if grounds exist for termination and if termination is in the child's best interests. Each factor that has application to the facts is relevant and a finding must be made on it, not merely on those factors that favor termination. When appropriate and applicable to the case, the trial court, therefore, shall evaluate and make findings on these additional "best interests factors." Sec. 211.447.6.
Here, findings on other factors in section 211.447.6 were quite relevant and should have been made by the trial court because there was evidence presented on them, much of which arguably would favor Mother. T.A.S. I at 811. For instance, as to factor (2), the evidence showed that Mother visited the children every day in the hospital for the two months after they were born, even expressing milk for them. When Mother placed the twins up for adoption, she sought an open adoption so she could maintain visitation with them. Mother saw the twins at every permitted opportunity. It was the trial court that limited her visitation. As to factor (3), she paid child support voluntarily, even after the trial court limited her visitation. Factor (4) could only weigh in favor of Mother's claim, given that she has complied with the entire parenting plan and took advantage of all offered services. Factor (5) (interest in and commitment to the child) also favors Mother. Finally, Mother has committed no felony offensesfactor (6).
Therefore, the trial court's findings as to section 211.447.6 are either absent or insufficient, *20 and such deficiencies constitute error.

D. Section 211.447.4(6)
Section 211.447.4(6) provides for termination of parental rights if:
The parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse, including but not limited to, abuses as defined in section 455.010, RSMo, child abuse or drug abuse before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child. It is presumed that a parent is unfit to be a party to the parent-child relationship upon a showing that within a three-year period immediately prior to the termination adjudication, the parent's parental rights to one or more other children were involuntarily terminated pursuant to subsection 2 or 3 of this section or subdivisions (1), (2), (3) or (4) of subsection 4 of this section or similar laws of other states.
The trial court found that Mother had abused the twins in such a way as to satisfy both prongs of section 211.447.4(6)finding both a "consistent pattern of committing a specific abuse" and "specific conditions directly relating to the parent and child relationship." Both prongs must be (and were) accompanied by a finding that they will "be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child." In the Interest of C.W. and S.J.W., 64 S.W.3d at 325.
Subdivision (6) describes findings that the parent continues to have parenting problems that endanger the child coupled with an inability to remedy those problems within the reasonably foreseeable future. See Roya R. Hough, Juvenile Law: A Year in Review, 63 Mo. L.Rev. 459, 465-66 (1998) (focus in broad language of subdivision (6) is on "kid time"whether "from the child's perspective, the amount of time necessary for the parent to overcome the barriers to reunification is unreasonable, as measured by the child's need for permanency at the earliest possible date"). Past abuse alone cannot be a basis for terminating parental rights under subdivision (6). Instead, the abuse must be of such a duration and nature that the trial court determines that the parent will not remedy the problem and so it renders the parent unfit for the reasonably foreseeable future. In the Interest of P.C., B.M., and C.M., 62 S.W.3d at 606.
In support of termination under this subdivision, the trial court cited:
... "Mother's" continued stress and being overwhelmed with the reality of "The Twins"; "Mother's" continued indecisiveness in dealing with the lives of "The Twins" and their welfare; and the lack of family support for "Mother" in caring for health and welfare of "The Twins".
As discussed above, these findings are insufficient to support termination, even in combination. They are particularly inappropriate for section 211.447.4(6). They do not describe a parent that continues to have parenting problems that endanger a child coupled with an inability to remedy those problems within the reasonably foreseeable future. They are specific past acts or conditions and the record indicates that all of them ended by the time of the termination proceedings. Regardless of the past, section 211.447.4(6) "requires *21 the trial court to determine that the parent is currently unfit ... to be a party to the parent and child relationship." T.A.S. I at 815 (emphasis added). Such a determination must be supported by findings as to acts or conditions that persist at the time of termination. Id.
Therefore, the trial court's findings as to section 211.447.4(6) are insufficient, and the trial court's reliance upon section 211.447.4(6) as grounds for termination is error.

Conclusion
Mother's parental rights were terminated because of little more than her efforts to find an adoptive family for her twins. There is not substantial evidence in the record that Mother did so for personal gain, and the evidence is that she consistently sought to protect her twins by finding a good adoptive family that would allow her to retain contact with the twins. This cannot, without more, provide grounds for termination of parental rights.
Countless psychological and child development studies have shown that children especially infants and young children under the age of fivewho are needlessly separated from their familiar parent suffer resulting deficits in their emotional and intellectual development. Joseph Goldstein, Albert J. Solnit, Sonja Goldstein and Anna Freud, The Best Interests of the Child: The Least Detrimental Alternative, 20 (1996). The complex and vital parent-child interactions necessary for healthy child development "thrive in the protective enclave of family life under guardianship by parents who are autonomous." Id. at 90. "When family integrity is broken or weakened by state intrusion, [the child's] needs are thwarted.... The effect on the child's developmental progress is likely to be detrimental." Id. Accordingly, courts should follow an approach of cautious restraint in intruding on the family relationshipan approach that recognizes that parents are generally entitled to raise their children as they think best, free from state interference, and that favors the minimum amount of state intervention necessary consistent with the best interests of the child. Parental rights should be terminated only when it is clearly necessary to ensure safe and permanent homes for children. Donald N. Duquette and Mark Hardin, Adoption 2002: The President's Initiative on Adoption and Foster Care, Guidelines for Public Policy and State Legislative Governing Permanence for Children, VI-1 (1999). "A parent's interest in retaining custody of his children is both legally cognizable and substantial, and may not be overridden in the absence of persuasive evidence that the children's well-being requires that custody be placed elsewhere." 59 Am Jur 2d Parent and Child sec. 36 (2003).
Many of the findings necessary to support a termination of Mother's parental rights as to the twins are absent from the trial court's ruling. The findings actually provided by the trial court are insufficient to support termination.
The judgment is reversed and the cause is remanded. If further proceedings include the termination of Mother's parental rights, the trial court is directed to consider and make findings on each of the statutorily required subdivisions or factors for all grounds for termination of parental rights on which the trial court bases its decision.[9]
*22 WHITE, C.J., WOLFF and STITH, JJ., concur.
PRICE, J., dissents in separate opinion filed.
BENTON and LIMBAUGH, JJ., concur in opinion of PRICE, J.
WILLIAM RAY PRICE, JR., Judge, dissenting.

I.
I respectfully dissent. Although the majority opinion states the standard of review, it then proceeds to disregard that standard by ignoring the trial court's credibility determinations, ignoring the evidence that favors termination, and reweighing the evidence.[1] Furthermore, the majority disregards the instruction in section 211.443, RSMo 2000,[2] to interpret the pertinent statutes "so as to promote the best interests and welfare of the child" and instead interprets the statutes solely to promote Mother's interests at the expense of the twins' well-being.
Evaluating the judgment in accordance with the standard of review reveals that substantial clear, cogent, and convincing evidence supports the trial court's judgment terminating Mother's parental rights pursuant to section 211.447.4(6). I would affirm on that basis.

II.
Although the trial court terminated Mother's parental rights for a number of reasons, "[s]atisfaction of one statutory ground for termination is sufficient to terminate parental rights if termination is in the child's best interest." In the Interest of E.L.B., 103 S.W.3d 774, 776 (Mo. banc 2003). For this reason, it is necessary to focus only upon the trial court's finding that termination was warranted pursuant to section 211.447.4(6). This subdivision provides for termination when:
[t]he parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse, including but not limited to, abuses as defined in section 455.010, RSMo, child abuse or drug abuse before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child.[3]
In termination of parental rights cases, appellate courts should defer to the trial court's ability to judge the credibility of witnesses and should sustain the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law. *23 In the Interest of M.E.W., 729 S.W.2d 194, 195-96 (Mo. banc 1987). Appellate courts also should review conflicting evidence in the light most favorable to the judgment of the trial court. Id. at 196. "Clear, cogent and convincing" evidence is required to support the trial court's finding that a ground for termination of parental rights exists, and appellate courts must take that into account when reviewing whether "substantial evidence" supports the trial court's judgment. See sec. 211.447.5.
Appellate courts should recognize that the trial court occupies a "superior position" from which to "judge the credibility of witnesses and their character, sincerity, and other intangibles that might not be completely shown in the cold record." Young v. Young, 59 S.W.3d 23, 29 (Mo. App.2001). In considering witness testimony, "[a] trial court is free to believe or disbelieve all, part, or none" of a witness's testimony. Id.
The trial court found that Mother engaged in a "consistent pattern of emotional abuse" of the twins. See sec. 211.447.4(6). Mother's pattern of behavior toward the twins supports this finding, particularly her failure to consider their well-being when making decisions about their care and in her repeated placement and subsequent withdrawal of the twins for adoption.[4]
The trial court also found that Mother's pattern of abuse was "of a duration or nature that renders [her] unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs" of the twins. Sec. 211.447.4(6). The following evidence in the record is substantial and clearly, cogently, and convincingly supports these findings. See M.E.W., 729 S.W.2d at 195-96; sec. 211.447.5.

A. Evidence of abuse and neglect prior to first adoptive placement
The record reveals that when Mother was pregnant, her doctor prescribed a medication for her to prevent premature labor. Mother quit taking the medicine of her own accord, and she later told a psychologist that she stopped taking the medicine because "she was tired of being pregnant." The twins were born at 28 weeks, or approximately three months prematurely, and they weighed slightly more than two pounds each. Mother had similarly stopped taking this medication in a previous pregnancy because "she didn't like to be on medication," and that child was also premature.
The twins' pediatrician testified that, after their release from the hospital, Mother missed their first appointment and three weeks elapsed between their release and first visit to him. He described the twins at that time as having "numerous medical problems" and said this initial visit for the twins after their departure from the hospital was "very important."[5] As a result of *24 missed appointments, the doctor sent a letter to DFS stating that "[n]ot showing up for routine medical visits for the twins is not acceptable care."

B. Evidence of Mother's abuse and neglect in placing twins for adoption
Mother testified she first considered adoption because the twins' father told her no man would want her with three children, much less five of them. A disturbing statement in its own right, it prefaced Mother's chain of decisions predicated on her own desires that demonstrated her "unfit to be a party to the parent and child relationship." Sec. 211.447.4(6).
Mother first attempted to place the twins with R.A. and V.A., a married couple residing in California. She admitted placing the twins with them "because they were well off financially." Mother acknowledged that she was aware of V.A.'s criminal record before placing the twins with them. After leaving the twins in the custody of R.A. and V.A., Mother surreptitiously removed the twins from their home a month and a half later because she heard a rumor "they were strapped for money or they were filing for bankruptcy" and because when Mother called them, V.A. "acted nonchalant."[6] She told R.A. and V.A. she was taking them out for a visit, when in fact she took them to a hotel where A.K. and J.K., a married couple residing in the United Kingdom, met her two days later.
After driving from California to Arkansas with A.K. and J.K., Mother transferred custody of the twins to them. A child abuse investigator from DFS testified that Mother said she had placed her children with A.K. and J.K. because they were going to allow her to come to the United Kingdom every year on the twins' birthday, which would be a good experience for her, and that she thought they would pay her airfare for those annual visits.
Mother's first objection to A.K. and J.K. having custody of the twins occurred approximately on January 16, 2001, as a response to media reports that she had sold the twins over the Internet.[7] British authorities rendered the placement with A.K. and J.K. short-term by taking custody of the twins on January 18, 2001, approximately two and a half weeks after their arrival in the United Kingdom, based on allegations of A.K.'s and J.K.'s unfitness.[8]
*25 Both placements of the twins, with R.A. and V.A. and with A.K. and J.K., were illegal under Missouri law. The transfer of custody from Mother to both couples violated section 453.110,[9] the purpose of which is "to prohibit the indiscriminate transfer of children" and to prevent parents from passing them on "like chattel to a new owner." In re Baby Girl ___, 850 S.W.2d 64, 68 (Mo. banc 1993).
Mother also admitted that she gave a false address to the Arkansas court to effect the twins' placement with A.K. and J.K. Mother told a psychologist that she knew she was required to be an Arkansas resident to ensure the twins' adoption there, so she used an aunt's Arkansas address instead of her own. Relying on her falsified information, the probate court of Pulaski County, Arkansas, entered an adoption decree for the twins on December 22, 2000. After learning that none of the parties was an Arkansas resident at the time the adoption decree was entered, the Arkansas court entered an order on March 6, 2001, to set aside that decree for lack of jurisdiction.

C. Evidence of Mother's use of twins for financial or other gain
Throughout the course of seeking an "open adoption,"[10] Mother accepted multiple gifts from the prospective parents. From R.A. and V.A., she received approximately $300 worth of clothes for her other children. They paid approximately $50 to have her hair braided and gave Mother a pair of diamond earrings. A.K. and J.K. brought some small gifts for N.W. when they met Mother in California and mailed N.W. more gifts later that year. During the drive from California to St. Louis, they *26 purchased additional items for Mother's children.
The placements in California and the United Kingdom permitted Mother to receive free travel, lodging, meals, and airfare. She, N.W., and the twins stayed at R.A. and V.A.'s house in California for nine days without Mother contributing to any of the expenses. A.K. and J.K. paid the remainder of Mother's and N.W.'s expenses for that trip. Mother also did not pay for the airfare to visit the twins in the United Kingdom.
Mother further used her children as a means to receive more welfare benefits than she was entitled. In an application dated January 2001, Mother listed her household as including all five of her children. She later admitted that her two sons had been living with her mother since August 2000, and the twins had been residing in adoptive homes since October 2000. As a result of this false statement, Mother received approximately $3,000 in temporary aid and food stamp benefits to which she was not entitled. Mother pleaded guilty to welfare fraud and was ordered to pay restitution for this crime.
When Mother, N.W., the twins, A.K. and J.K. were driving cross-country, they were stopped by police in Kansas for speeding. In an effort to avoid the consequences, A.K., J.K., and Mother conspired to tell the police they were speeding because the twins were sick. Even though the twins were not sick at the time, one of them was then taken to the hospital and examined as a result of this ruse.
In her attempts to justify why she vacillated regarding adoption of the twins, why she placed them with the couples she chose, or why she withdrew them from custody, Mother never explained her actions in the context of what was best for the twins. In every situation, as she explained it, her decisions rested on what was better for her: whether she could obtain a boyfriend with five children, whether the twins would know her and she would receive letters and photos of them, whether the couple she selected was financially sound, and whether she could visit another country.

D. Evidence of emotional harm to twins resulting from Mother's abuse
In its analysis, the majority opinion ignores the trial court's evaluation of the expert witnesses' testimony as to the effects of this emotional abuse on the twins. In contravention to the standard of review, the majority focuses on the experts it finds to be more credible and supplants their conclusions for those of the expert relied upon by the trial court.
Dr. Joan Luby, Director of the Early Emotional Development Program and an assistant professor of psychiatry at Washington University, testified that the twins have Reactive Attachment Disorder ("RAD"). Dr. Luby described RAD in lay terms as a "disorder that can arise in young children when they have had a very unstable environment early in life" and can be "characterized by multiple different placements, sometimes by abuse or neglect."
RAD occurs "when the child fails to develop a normal, healthy, secure attachment to a single caregiver," which typically occurs during the first 12 months of life. The inability to develop a secure attachment can result in developmental difficulties in general, according to Dr. Luby, and specifically in emotional development. For example, children with RAD can be withdrawn and apathetic, refusing to react when they are hungry or need a diaper change. In addition, they "can have indiscriminate engagement with any adult as *27 opposed to stranger anxiety" and can have general difficulty forming emotional attachments throughout their lives.
Dr. Luby testified that the twins' RAD appeared to be in remission when she evaluated them, which she attributed to the fact that, at that time, they had been in a "neutral, stable environment for about four months" with their foster parents. Dr. Luby testified that of the three forms of the disordersevere, moderate, and mildthe twins' RAD was moderate. Even after adjusting the twins' actual age to account for their premature births, Dr. Luby testified they both appeared "somewhat developmentally delayed" and that "they still showed a certain level of apathy." The twins, Dr. Luby noted, "showed absolutely no stranger anxiety" toward the examiner, and they were less attached to their caregivers than she would have preferred, although they demonstrated selective attachment to the foster parents.
The majority opinion mischaracterizes the import of the testimony by Dr. Luby, whom the trial court expressly found "to be credible and believable."[11] Dr. Luby stated numerous times that the purpose of her examination of the twins was not to determine who should have custody of them, and she would not comment as to the desirability of any particular custodial arrangement. She stressed, however, that any disruption of the twins' placement with their foster parents would be detrimental to their emotional health. Dr. Luby also noted that, based on the twins' history with Mother, she would be "concerned" if they were returned to her.
The majority attempts to justify its preference for other experts, as opposed to the trial court's reliance on Dr. Luby's testimony, by noting that the other experts observed Mother's interaction with the twins. First, this approach ignores that the primary purpose of Dr. Luby's visit was to evaluate the emotional health of the twins. Second, it disregards the fact that the other experts observed the twins approximately one year after Dr. Luby. During the interim, the twins were in a stable home and in the primary care of the foster parents instead of Mother, yet the majority wishes to credit the twins' improvement to Mother. Third, the majority fails to recognize that Dr. Luby is an expert in child psychology, while the experts touted by the majority admittedly were not.[12] Fourth, the duration of Dr. Luby's observation of the twins was twice that of Dr. Cuneo's or Dr. Rosen's. Finally, and perhaps most important, it is the discretion of the trial court to determine which witnesses it believes and by which of those witnesses it is persuaded.

E. Evidence of Mother's inability to provide a stable home for the twins
In its decision terminating her parental rights, the trial court recognized Mother's inability, for many reasons, to care properly for the twins' "ongoing physical, mental or emotional needs." Sec. 211.447.4(6). Mother confided to an acquaintance that *28 she was giving the twins up for adoption because of the financial burden, medical problems, and stress. The trial court found that termination was warranted because of the persistence of Mother's continued stress and sense of being overwhelmed, her continued indecisiveness, and a lack of family support for her. The majority, however, states that "there is no evidence that the support Mother will receive will be any different than the support she received for her other children."
Nothing in the record indicated Mother was capable of providing a stable home environment for the twins. Mother changed employment approximately 24 times from 1997-2002. Two members of her family testified that she was incapable of handling the twins. A DFS worker testified that Mother provided an unstable environment by moving numerous times. Furthermore, Mother's plan to take care of the twins involves the three of them staying at her mother's with J.G., J.S, and N.W. The children's grandmother and stepgrandfather have a three-bedroom home with an occupancy permit for four people, and they already have a grown son living with them. As such, Mother's plan would result in nine people living in her mother's home and is not realistic. Most telling is that Mother was equivocal in her own testimony concerning whether it was in the twins' best interests for them to return to her.[13]

F. Evidence of a lack of family support for Mother and the twins
The trial court referenced a "lack of family support" in its decision to terminate Mother's parental rights. A DFS employee testified that Mother's relatives requested custody of the twins when they were still in her custody. Mother, however, initially refused to consider family members as foster or adoptive parents.
After the twins returned from the United Kingdom and were in DFS custody, DFS informed Mother that any of her relatives interested in custody of the twins should contact DFS. None of the relatives came forward until the twins' maternal grandmother offered to adopt them after they were in foster care for 11 months.
A DFS employee testified that the maternal grandmother offered to adopt the twins and then rescinded that proposal within the same telephone conversation. The twins' maternal grandmother also told a DFS worker she was willing to help with J.G. and J.S., Mother's sons, but she was not willing to help Mother with the twins, who were Mother's responsibility. Mother *29 testified that the boys began staying with their grandmother in the fall of 2000 to facilitate their attendance in the Ladue school district.
The twins' father maintains visitation rights to N.W., and he also has child support obligations for her. His parental rights as to the twins, however, were voluntarily terminated in October 2002.

G. Evidence of Mother's personality profile supports likelihood of future abuse
Psychological evidence also provided insight into Mother's actions regarding the twins and her inability to provide the twins with a stable environment. Dr. Susan Randich, a psychologist, conducted a personality inventory on Mother. Dr. Randich testified that Mother "displayed immaturity and made poor decisions with the children," "tended to gloss over and minimize any kind of problems," and "might have a low tolerance for stress." In her evaluation, Dr. Randich wrote that people with a personality profile similar to Mother's "have little insight into their own behavior and motivations and little awareness of the consequences of their behavior on other people." She testified that Mother's repeated consideration of adoption followed by rejection of the idea reflects that "she is pretty susceptible to manipulation or influence by others." She agreed that Mother's prolonged indecisiveness regarding adoption of the twins was not in their best interests. Moreover, Dr. Randich testified it was not clear whether Mother was willing to parent the twins and that the first two years of life are extremely important in the bonding process of a child.
As for the twins' ongoing physical, mental, and emotional needs, the twins have RAD, speech delays, and asthma. Dr. Luby testified that these conditions require monitoring by a "very emotionally stable, emotionally available, nurturing, giving parent who can devote a lot of energy to them." Mother has not demonstrated an ability to furnish the twins with these qualities in a parent. Cf. M.E.W., 729 S.W.2d at 197 (child with special physical, educational, and emotional needs required extra attention and stable home environment his mother was unable to provide).
The majority opinion focuses on the fact that two failed placements alone do not constitute "emotional abuse" and that the trial court's decision relied solely on past behavior that was not linked to future behavior. Mother's pattern of behavior, however, evidences the traits and tendencies of her behavior toward the twins. The trial court's justification for terminating pursuant to section 211.447.4(6) was not limited to the grounds expressly included within that finding, and the justification included those grounds within the context of all the testimony heard.
Any improvements that Mother has made in her life have largely occurred after the termination petition was filed. Mother's conduct after the filing of a termination petition cannot constitute the sole consideration of the court's decision. A court must look at the totality of a parent's conduct both prior to and after the filing of the termination petition. Otherwise, a parent can always argue that she or he has reformed since the filing of the petition, reformation usually occurring while the child is away. For these reasons, a parent's conduct after the termination petition has been filed may not be compelling.
In the Interest of C.L.W., 115 S.W.3d 354, 358-59 (Mo.App.2003) (citations and quotations omitted).
The majority claims there was no evidence that Mother would continue this *30 behavior in the future. The evidence supporting the judgment was based on Mother's particular pattern of actions toward the twins and included not only the two failed placements but also the protracted vacillation regarding adoption.[14] In light of Mother's personality traits as attested to by Dr. Randich, this pattern is likely to continue. A DFS worker testified at the termination hearing that the circumstances since the adjudication and dispositional hearings had not changed. Mother, however, presented no evidence at the termination hearing. As a result, it is unclear on what evidence the majority's claim is based.

III.
The majority cites, in its conclusion, studies showing that children needlessly separated from their parents suffer resulting deficits in their emotional and intellectual development. This point is undisputed. Even Mother, despite her initial testimony that she had never considered the emotional impact on the twins of her consistent pattern of placing and removing them and that she was the victim in this case, admitted subsequently that the twins were harmed by the multiple placements.
The majority also relies on authority that a child's developmental progress can be hampered by state intrusion. The majority ignores, however, that since the twins were released from the hospital in August 2000, they have been in Mother's sole care, custody, and control for 52 days.[15] The absence of the twins from her custody was not her choice after DFS removed them upon their return from the United Kingdom, but the failed placements were direct consequences of her decisions and actions accomplished without mention of concern for the twins' well-being. The majority ignores that Mother voluntarily succumbed the custody of the twins to othersboth times purportedly permanentlyand that the state intervened only after the second placement was deemed unfit by foreign authorities acting on behalf of the twins' welfare. Any compromise in her family's integrity was accomplished directly as a result of Mother's decisions made without consideration of the twins' well-being.
The reality of this case is that the twins were born on June 26, 2000, and have been in the custody of foster parents since April 18, 2001, where they also have an adopted sibling. The testimony revealed that the twins need a stable environment and special attention to their emotional and physical needs, and Mother has never exhibited any ability to provide that for them.

IV.
When the trial court has received conflicting evidence, as in the instant case, the role of this Court is to "review the facts in the light most favorable to the trial court's judgment." M.E.W., 729 S.W.2d at 196. In its review, the Court should "give due regard to the trial court's opportunity to judge the credibility of witnesses and sustain the decree unless there is no substantial evidence to support it, it is contrary to the evidence or it erroneously declares or applies the law." Id. at 195-96. "As long as the record contains credible evidence upon which the trial court could have formulated its beliefs," an appellate court should not "substitute its judgment for *31 that of the trial court." Patton v. Patton, 973 S.W.2d 139, 145 (Mo.App.1998).
The standard of review precludes this Court from searching the record for facts that could have supported a contrary judgment from the trial court. Unfortunately, that is exactly what the majority has chosen to do. Perhaps more unfortunately, the majority has chosen to sacrifice the best interests and welfare of two innocent children in favor of a parent who has demonstrated, time and again, her inability to make appropriate decisions concerning their care. In doing so, the majority deviates from the dictate of section 211.443, which requires courts to interpret the termination of parental rights statutes "so as to promote the best interests and welfare of the child."
Substantial clear, cogent, and convincing evidence supports the trial court's finding that termination of Mother's parental rights was justified pursuant to section 211.447.4(6) and that termination was in the twins' best interests. I would affirm the judgment.
NOTES
[1] All statutory references are to RSMo 2000.
[2] A.W., the twins' father, consented to termination of his parental rights in October 2002. He did not appeal the termination of his parental rights.
[3] Transfer is pursuant to Mo. Const. art. V, section 10. Rule 83.01 allows for transfer upon application prior to disposition by the appellate court:

This Court on its own motion or on application of a party may transfer to this Court from the court of appeals a case in which there has been no disposition. The transfer shall be for any of the reasons stated in Rule 83.02 or for the purpose of equalizing the workload of the appellate courts.
Rule 83.02 authorizes transfer to this Court "because of the general interest or importance of a question involved in the case or for the purpose of reexamining existing law." This Court's transfer ameliorates the effect of repeated delays in the preparation of the transcript, that in turn caused a nearly one-year delay in consideration of the case by the appellate court.
[4] Subsequent media reports that Mother sold her twins on the internet were investigated by the state and revealed to be completely false. There was some evidence that Mother accepted small gifts, including earrings, but no gift was worth more than $100 and nothing in the record supports the media suggestions that Mother was attempting to sell the twins.
[5] Mother twice failed in her efforts to find a suitable placement for her twins, yet this is not uncommon. The difficulty in finding safe permanent homes for children is illustrated by data that children in the custody of Missouri DFS are moved from placement to placement an average of over three times per child. Citizens for Missouri's Children, Children's Trust Fund, KIDS COUNT in Missouri 2002 Data Book, 36 (2003).
[6] "[I]t is inappropriate to use prior determinations of neglect as dispositive on the neglect issue at the time of the termination hearing. Courts are generally required to make new findings of fact based on the changed conditions in light of the parents' history of neglect and likely future neglect.... Most courts will agree that neglect must exist at the time of the termination hearing, and that it is inappropriate to terminate a parent's rights on the basis of neglect that happened in the remote past and no longer exists." 32 Am Jur Proof of Facts 3d Parental Rights sec. 6 (2003).
[7] Although it was not explicitly relied upon by the trial court in the termination of parental rights, Mother pleaded guilty to welfare fraud because she provided false information and failed to provide required information to the state. Considering the severity of the crimes described in subdivisions 211.447.4(4) and 211.447.6(6), welfare fraud of this nature is not abuse, and the trial court correctly declined to include it as supporting termination.
[8] "Before the court can use mental incapacity as the basis for terminating a parent's rights, it must find that the mental defect or disability renders the parent unable to provide for the needs and well-being of his or her children.... It is sufficient to show that the parent's emotional problems are so severe as to prevent the maintenance of any meaningful relationship with his or her children. In such cases, it is often necessary to provide expert testimony that the parent's emotional instability is not likely to improve in the future.... In order to prevail in a termination proceeding based on mental incapacity, the petition should present sufficient evidence of the adverse effects which the parent's incapacity has on the well-being of the child. Absent such a showing, most courts will be reluctant to order termination on this ground alone." 32 Am Jur Proof of Facts 3d Parental Rights sec. 5 (2003).
[9] As the judgment is reversed and the cause is remanded, Mother's other claims of error need not be reviewed. Because the case is remanded for further proceedings on all three grounds for termination, the issue of whether the termination was in the twins' best interests is not reached.
[1] For example, in the section labeled "VI. Trial court's findings," the majority expressly indicates it undertakes a separate analysis for each finding the trial court issued in support of its conclusion to terminate Mother's parental rights. The majority states that it will evaluate each factual conclusion by the trial court to determine "whether there was sufficient reason to believe that it had an impact upon the twins, whether it was severe enough to constitute abuse or neglect and whether it provides an indication of the likelihood of future harm to the twins."
[2] All further statutory references will be to RSMo 2000.
[3] Termination pursuant to section 211.447.4(6) requires an additional finding that termination was in the best interests of the child, in this case, the twins. See sec. 211.447.5. The trial court found, and the evidence supports, that the termination of Mother's parental rights was in the twins' best interests.
[4] Since the twins returned to the United States on April 18, 2001, they have been in the custody of their foster parents. The foster parents have an adopted son who is approximately nine months older than the twins. The son was placed with the foster parents prior to the twins' arrival and has remained in the parents' custody since that initial placement. The foster parents' adoption of the twins was approved at the circuit court level, but Mother moved to stay that adoption pending the resolution of this appeal.

Mother's court-ordered visits and child support obligations to the twins concluded on June 23, 2002, by order of the trial court. The twins turned two years old three days after that last visit. They are nearly four years old now.
[5] The pediatrician testified that Mother had repeatedly missed visits with him for her other children. With her oldest son, J.G., who has a heart problem, Mother missed at least six appointments, and she missed at least four appointments with the twins' sister, N.W.
[6] Mother testified that she called or talked to V.A. "practically every day" when the twins were in R.A. and V.A.'s custody, which was from approximately October 19 through November 29, 2001. Mother stated V.A. made her feel like she "was being a pest" and V.A. "act[ed] nonchalant, like why was [Mother] calling her" one day when Mother called. Mother cited this conversation and reports of their financial problems as the only reasons she withdrew the children from R.A. and V.A.'s custody.
[7] As Mother put it, "January 16th is when my life was on the news." She expressed no concern as to any effect this media exposure may have had on the twins.
[8] During the summer of 2001, Mother resumed her attempts to place the twins for adoption. She requested a meeting with the twins' foster parents in July to speak with them about adopting the twins. By the end of August, however, she had changed her mind again and withdrawn her offer to consent to adoption.

Even though she had previously declined to attempt to place the twins with her family and her mother had indicated earlier she did not want the twins, in April 2002 Mother testified that she would be amenable to letting her mother adopt the twins because then she could stay with them at her mother's.
[9] Section 453.110 provides:

1. No person, agency, organization or institution shall surrender custody of a minor child, or transfer the custody of such a child to another, and no person, agency, organization or institution shall take possession or charge of a minor child so transferred, without first having filed a petition before the circuit court ... and having obtained such an order form such court approving or ordering transfer of custody.
....
3. Any person violating the terms of this section shall be guilty of a class D felony.
[10] "Open adoption" permits a continuing relationship between the biological parents and the adoptee. Naomi Cahn, Perfect Substitutes or the Real Thing?, 52 Duke L.J. 1077, 1151 (2003). Traditionally, adoption law required the severance of all legal ties between the child and the biological parents, thereby precluding even informal ties by denying both sets of parents information about the other. Carol Sanger, Separating From Children, 96 Colum. L.Rev. 375, 489 (1996).

During the last two decades, organizations of adult adoptees have "argued that secrecy was not at all in their best interests and demanded information about their biological origins." Id. Forty-one states have responded to these demands and now allow adult adoptees to receive "nonidentifying information" about their biological parents. Id. at 489-90.
The release of this information ideally benefits the child by providing adoptees and their parents with medical or genetic histories and satisfyingat least to some extentthe psychological needs of the children. Id. at 490. "In contrast, demands by birth mothers themselves to discover what became of their children have rarely been considered sufficient to breach the confidentiality of the closed records." Id. Missouri law allows for post-adoption contact only "at the discretion of the adoptive parents." Sec. 453.080.4.
In this case, Mother did not seek an open adoption because it would benefit the twins psychologically or provide them a complete medical history. Instead, she testified that she desired an open adoption because: "I wanted to see my girls. I wanted my girls to know who I was. I wanted my kids to be able to see their siblings. I wanted pictures, letters." These reasons, which only benefit the birth parent, typically provide inadequate justification for infringing upon the privacy of closed adoption records. See Carol Sanger, Separating From Children, 96 Colum. L.Rev. 375, 490 (1996).
[11] Although the trial court summarized in its findings the testimony of the expert witnesses relied on by the majority, it included no statement as to their credibility. One of those experts, Dr. Daniel Cuneo, was the father of a law student assisting Mother with her case.
[12] Dr. Daniel Cuneo testified that in 24 years with the Illinois Department of Mental Health, he had conducted very few evaluations of children under two and approximately 200 evaluations of children overall. Dr. Dean Rosen testified that he had conducted either no or very few evaluations of children under the age of two without their parents. He said he would not hold himself out as an expert in early childhood psychology.
[13] While at one point Mother testified that she believed it was in the twins' best interests to be returned to her, later that same day, the following exchange occurred:

Q You feel that it would be in their best interests for them to be placed with you immediately?
A That's what I would like.
Q Well, I'm asking you do you believe it would be in their best interests to do so?
A I think it should be a gradual increasing of more visits. I think it would be gradual.
Q You don't believe it would be in their best interests for them to be placed with you today?
A I didn't say that. I just saidI would love the Judge to say I'm going to give the girls back to you.
Q Okay. That's what you want him to say, correct?
A Of course.
Q When do you think he should place the children with you?
A I don't know.
Q You don't know?
A No, I don't.
Q You believe that your life is as stable as it's going to be right now, is that correct?
A I'm a parent, so I'm always growing. The twins were nearly 22 months old when this testimony occurred.
[14] Many of the findings at issue in the present case were initially included in the dispositional judgment filed May 24, 2002, which Mother did not appeal.
[15] This total of 52 days includes the nine days Mother was staying in the house of R.A. and V.A.