Opinion issued August 20, 2015



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00515-CV

————————————

## KOSOCO, INC., Appellant

## V.

## METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, Appellee

On Appeal from the County Civil Court at Law No. 4
Harris County, Texas
Trial Court Case No. 1010709

## MEMORANDUM OPINION

Appellant, Kosoco, Inc., challenges the trial court's order dismissing, for lack of jurisdiction, its inverse-condemnation claims[1] against appellee, Metropolitan Transit Authority of Harris County ("Metro"). In three issues, Kosoco contends that the trial court erred in dismissing its lawsuit.

We affirm.

## Background

In its original petition, Kosoco alleged that, since 1980, it has operated a gasoline station and convenience store at 2102 North Main Street in Houston, Texas (the "Property"). In 2010, Metro began construction of a light rail line on North Main Street (the "North Line"). During the first stage of construction, the relocation of underground utility lines resulted in "numerous water outages lasting anywhere from hours to days." Metro also installed an "electric rail pole" in front of Kosoco's "fuel price LED sign, preventing customers from seeing it." And when Metro subsequently closed portions of North Main Street to conduct demolition, it "effectively closed off [Kosoco's] business from all customers that use North Main," requiring its "downtown customers" to "travel an additional 28 blocks" to access the Property.

Kosoco further alleged that the "construction caused total, temporary restrictions of access" to the Property and the "final construction will result in a

---

[1] *See* TEX. CONST. art. I, § 17.

2

partial, but permanent restriction of access" to the Property. "As a result of these closures, demolition, and construction[,] the vehicle traffic has been greatly reduced," its business has been "destroyed," and two of its commercial tenants have gone out of business, resulting in lost rents to Kosoco. Kosoco sued Metro for inverse condemnation, asserting that Metro's construction of the North Line resulted in a "taking, damaging, or destroying" of its Property for public use without adequate compensation.[2]

In its Motion to Dismiss for Lack of Jurisdiction, Metro argued that Kosoco had not alleged a cause of action for which Metro's governmental immunity had been waived because the facts underlying Kosoco's claims did not establish a "material and substantial impairment of access." It asserted that to the extent that "third-party contractors negligently interfered with access to the property or disrupted water and electric service, such acts [were] not attributable to Metro." Metro attached to its motion the affidavit of its representative, Michael Bruce Krantz, who testified as follows:

- The Property is located at the northeast corner of North Main and Paschall between Hogan and Quitman. It is on the block bounded by North Main on the west, Paschall on the south, Freeman on the east, and Henry on the north.

- Access to the Property is available by means of four driveways: one that provides access to and from North Main, two that provide access to and from Paschall, and one that provides access to and

---

[2] *See id.*

3

from Freeman. The configuration of these driveways was not altered by the construction of the North Line.

- Prior to the construction of the North Line, portions of North Main, including the segment between Hogan and Quitman Street, consisted of three ten-foot-wide southbound lanes and three ten-foot-wide northbound lanes.

- Following the construction of the North Line, that segment of North Main generally has a single lane for northbound vehicular traffic, a single lane for southbound vehicular traffic, and a twenty-six-foot-wide light rail guideway in the middle of the street. Between Paschall Street and Henry Street, the lanes for vehicular traffic are sixteen feet wide.

- Prior to construction of the North Line, vehicular traffic on North Main, Paschal, and Freeman could access the Property by turning left or right into the driveways abutting those streets. Following construction, the only change in access to the Property is that vehicles traveling southbound on North Main are no longer able to turn directly into the Property. However, such vehicles can still travel to the Property by (i) making a u-turn at Hogan and traveling four blocks north on North Main or (ii) turning left at Hogan and traveling east for one block, turning left on Freeman, and traveling four blocks north to the Property.

- Prior to construction of the North Line, vehicles could exit the Property by turning right or left out of any of the driveways onto the abutting street. Following construction, the only change in access from the Property is that vehicles are not able to turn directly into the southbound lane of North Main. However, vehicles can still access that lane by (i) heading north three blocks on North Main to Quitman and making a u-turn or (ii) going south on Freeman to Hogan, turning right and heading west on Hogan for one block, and making a left turn into the southbound lane of North Main.

4

Metro also attached to its motion the affidavit of Michelle Solomon, an investigator it had hired to "observe and record" traffic patterns and "the types and numbers of vehicles entering and exiting" the Property; Solomon's daily logs and photographs; a copy of the deposition transcript of Louis Namgoong, Kosoco's corporate representative; roadway engineering diagrams; and a copy of the contract governing construction of the North Line.

In its response to Metro's motion, Kosoco asserted that "[t]he doctrine of sovereign immunity does not apply to inverse condemnation cases." It also asserted that the "undisputed facts relevant to [the trial court's] jurisdiction" were that before construction of the North Line began, North Main Street had "three lanes, each 30 [sic] feet wide, northbound and another three lanes, each 30 [sic] feet wide southbound." And, after construction of the North Line, the section of North Main Street adjacent to the Property now "consists of a single lane, 16 feet wide," which has rendered access to the Property "difficult."

Kosoco attached to its response a copy of the deposition transcript of its corporate representative, Namgoong, who testified that the "rail structure in the middle of North Main Street" has caused a "reduced amount of navigable area for . . . delivery drivers, delivery trucks, grocery trucks, [and] beer trucks." Kosoco also attached a report from David Hall, a traffic engineer, who opined that since the "final construction of the center median on North Main Street for the

[North Line]," access to the Property, although "not impossible," has been rendered "difficult." Hall also noted that the "[i]ntersection and driveway access to/from North Main Street has been blocked, which impairs and makes site access movements difficult."

**Standard of Review**

A motion to dismiss for lack of jurisdiction is the "functional equivalent" of a plea to the jurisdiction. *Lacy v. Bassett*, 132 S.W.3d 119, 122 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see Willie v. Comm'n for Lawyer Discipline*, No. 01-11-00428-CV, 2012 WL 761241, at *3 (Tex. App.—Houston [1st Dist.] Mar. 8, 2012, no pet.) (mem. op.). A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Villarreal v. Harris Cnty.*, 226 S.W.3d 537, 541 (Tex. App.—Houston [1st Dist.] 2006, no pet.). We review de novo a trial court's ruling on a jurisdictional plea. *See Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 323 (Tex. 2006); *City of Hous. v. Vallejo*, 371 S.W.3d 499, 501 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

A plea to the jurisdiction may be utilized to challenge whether the plaintiff has met its burden of alleging jurisdictional facts or to challenge the existence of jurisdictional facts. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d

6

217, 226–27 (Tex. 2004). When a plea to the jurisdiction challenges the pleadings, we determine whether the pleader has alleged facts that affirmatively demonstrate the trial court's jurisdiction. *Id.* Review of a plea challenging the existence of jurisdictional facts mirrors that of a matter-of-law summary-judgment motion. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012); *City of Hous. v. Guthrie*, 332 S.W.3d 578, 587 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c). . . . By requiring the [political subdivision] to meet the summary judgment standard of proof . . . , we protect the plaintiffs from having to put on their case simply to establish jurisdiction."); *see also* TEX. R. CIV. P. 166a(c). A court may consider evidence as necessary to resolve a dispute over the jurisdictional facts, even if the evidence "implicates both the subject matter jurisdiction of the court and the merits of the case." *Miranda*, 133 S.W.3d at 226. We take as true all evidence favorable to the nonmovant and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id*. at 227; *see also Heckman v. Williamson Cnty*., 369 S.W.3d 137, 150 (Tex. 2012). If the defendant meets its burden to establish that the trial court lacks jurisdiction, the plaintiff is then required to show that there is a disputed material fact regarding the jurisdictional issue. *Miranda*, 133 S.W.3d at 228. If the evidence raises a fact issue regarding jurisdiction, the plea cannot be granted and a

fact finder must resolve the issue. *Id*. at 227–28. On the other hand, if the evidence is undisputed or fails to raise a fact issue, the plea must be determined as a matter of law. *Id.*

**Governmental Immunity**

In its first and second issues, Kosoco argues that the trial court erred in dismissing its inverse-condemnation claims because Metro, temporarily, "totally impaired" access to the Property during its construction of the North Line and, permanently, "partial[ly] impair[ed]" access to the Property by "chang[ing] the configuration" of North Main Street, rendering access to the Property "difficult." And Kosoco asserts that the doctrine of governmental immunity "does not apply to inverse condemnation cases."

The Texas Constitution prohibits a governmental unit from taking private land for public use as follows: "No person's property shall be taken, damaged or destroyed for, or applied to public use, without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17. A landowner whose property has been taken may bring an inverse condemnation proceeding to recover compensation for his loss. *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012); *City of Hous. v. Mack*, 312 S.W.3d 855, 861 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Generally, the doctrine of governmental immunity shields a governmental entity from suit, and, in the

absence of a waiver of immunity, a trial court has no subject matter jurisdiction over a suit against a governmental entity. *See Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999); *City of Hous. v. Hous. Firefighters' Relief & Retirement Fund*, 196 S.W.3d 271, 277 (Tex. App.—Houston [1st Dist.] 2006, no pet.). However, as asserted by Kosoco, the doctrine of governmental immunity does not shield governmental entities from valid takings claims. *Guthrie*, 332 S.W.3d at 591–92 (citing TEX. CONST. art. I, § 17; *Gen. Servs. Comm'n v. Little Tex Insulation Co*., 39 S.W.3d 591, 598 (Tex. 2001)). Determining whether a taking has occurred is a question of law. *Hearts Bluff*, 381 S.W.3d at 477.

"To demonstrate that a constitutional inverse condemnation has occurred, [a] landowner must show that (1) the State intentionally performed certain acts in the exercise of its lawful authority (2) that resulted in a taking of property (3) for public use." *Burris v. Metro. Transit Auth. of Harris Cnty.*, 266 S.W.3d 16, 20 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citations omitted). To show a compensable taking, a landowner must establish that a "material and substantial impairment" of access to the property occurred. *State v. Heal*, 917 S.W.2d 6, 10 (Tex. 1996). A landowner shows a material and substantial impairment of access by establishing (1) a total, temporary restriction of access; (2) a partial, permanent restriction of access; or (3) a partial, temporary restriction of access due to illegal or negligent activity. *State v. Schmidt*, 867 S.W.2d 769, 775 (Tex. 1993); *Burris*,

9

266 S.W.3d at 20. Whether there has been a material and substantial impairment to property as a result of a taking is a question of law. *Schmidt*, 867 S.W.2d at 777.

Metro, in its motion, argued that Kosoco had not alleged a material and substantial impairment of access to the Property because a "landowner is not entitled to compensation simply because a public improvement project results in decreased traffic volume adjacent to its property"; "modifications that result in drivers having to take a more circuitous route to reach a property do not give rise to a taking"; and "Kosoco has not been denied reasonable access" since "customers and vendors remain able to access the Property for its intended use."

Here, Krantz testified that access to the Property is available by means of four driveways and the configuration of these driveways "was not altered by the construction of the North Line." Following construction, the only change in access to the Property is that vehicles traveling southbound on North Main are no longer able to turn directly into the Property and vehicles at the Property are not able to turn directly into the southbound lane of North Main. And Krantz noted that vehicles traveling southbound on North Main can still access the Property by traveling an alternative route.

Moreover, Solomon testified that during her visits to the Property, she observed "[p]assenger cars, trucks, sport utility vehicles, delivery trucks, trucks pulling trailers, a full-sized fire truck, and small and mid-sized buses enter[ing] and

exit[ing] the Property." "No vehicles experienced any difficulty entering or exiting" the Property. And Solomon noted that the "majority of vehicles entering and exiting the Property use the North Main and Paschall driveways."

It is well-settled that diversion of traffic, diminished exposure to traffic, or altered accessibility to a roadway does not constitute a material and substantial impairment of access. *See State v. Petropoulos*, 346 S.W.3d 525, 532 (Tex. 2011). "[A]n abutting property owner does not have a vested interest in the traffic that passes in front of his property." *Schmidt*, 867 S.W.2d at 774 (quoting *DuPuy v. City of Waco*, 396 S.W.2d 103, 109 (Tex. 1965)); *see also State Highway Comm'n v. Humphreys*, 58 S.W.2d 144, 145 (Tex. Civ. App.—San Antonio 1933, writ ref'd) (noting "highways are primarily for the benefit of the traveling public, and are only incidentally for the benefit of those who are engaged in business along its way" and holding business owners necessarily assume risk new roads, which may "largely take away the traveling public," may be built). If one access point to a property is closed, access is not materially and substantially impaired if another access point on a public street remains unaffected. *City of San Antonio v. TPLP Office Park Props.*, 218 S.W.3d 60, 66 (Tex. 2007); *Burris*, 266 S.W.3d at 22–23 (although property owner may suffer diminished property value due to adjacent road closure, compensable taking has not occurred if property owner retains reasonable access to remaining adjacent road).

The uncontroverted evidence in this case shows that Metro's construction of the North Line did not change the four driveways providing access to the Property. Both ingress and egress remain available via the northbound lane of North Main Street, along with two driveways accessing Paschall Street and one accessing Freeman Street. The only change is that customers and vendors are no longer able to enter the Property directly from, or exit directly onto, the southbound lane of North Main. But the Property is still accessible via alternative routes. Thus, Kosoco cannot establish that it has been affected by a "material and substantial" impairment of access to its Property. *See TPLP Office Park*, 218 S.W.3d at 66; *Burris*, 266 S.W.3d at 24; *see also City of Waco*, 396 S.W.2d at 109 (explaining landowner entitled to compensation if public improvement destroys "all reasonable access" to property; however, no compensable taking exists if landowner has reasonable access to property after construction of public improvement).

In support of its assertion that Metro materially and substantially impaired access to the Property by rendering access "difficult," Kosoco relies on *City of Waco v. Texland Corporation*, 446 S.W.2d 1 (Tex. 1969). Texland sued the City of Waco for inverse condemnation, alleging that the City's construction of a viaduct had materially and substantially impaired access to its commercial warehouse. *Id.* at 2. The viaduct was supported by piers, one of which was located "almost directly" in front of Texland's loading dock and doors. *Id.* at 4.

12

Witness testimony showed that although it was "not impossible" for the large transport trucks serving Texland to maneuver in the area in front of the docks, it was "difficult," and in "some places" it was "almost impractical to get to." *Id.* The Texas Supreme Court held that these facts established a material and substantial impairment of access. *Id.*

In *Burris*, however, this Court considered, in light of *Texland*, whether Metro's construction of a light rail line on San Jacinto Street in Houston resulted in a material and substantial interference with access to an adjacent commercial property. 266 S.W.3d at 18–19. Prior to construction of the rail line, customers had access to the plaintiffs' property via two driveways. *Id.* at 18. After construction, Metro closed one driveway and changed the other driveway to egress only. *Id.* The plaintiffs sued Metro for inverse condemnation, arguing that it had materially and substantially impaired access to their property because there was no longer ingress from San Jacinto Street, as it was completely blocked by the rail line, and the only ingress was from a side street. *Id.* at 20. The plaintiffs, based in part on the reasoning of the supreme court in *Texland*, asserted that the "fact that some access to the Property remained from the side street . . . [was] immaterial." The plaintiffs noted that in *Texland*, the court concluded that the access to the property had been impaired, even though ingress was not totally denied. *Id.* at 21.

The *Burris* plaintiffs argued that the "taking" in their case was even more egregious than the taking in *Texland* because they had "*no ingress* whatsoever from their frontage on San Jacinto." *Id.* However, this Court noted that the plaintiffs presented no evidence that their customers and vendors could not access their property. *Id.* at 23. In fact, their customers and vendors still had ingress to the property via a side street and still had egress onto San Jacinto Street. *Id.* at 24. We then concluded that the closure of the ingress from San Jacinto Street did not constitute a material and substantial impairment. *Id.*

Here, likewise, Kosoco did not present any evidence that its customers and vendors cannot access the Property. *See id.* And the uncontroverted evidence shows that the Property is still accessible via the side streets. *See id.*; *TPLP Office Park Props.*, 218 S.W.3d at 66–67 (noting "issue of whether reasonable access remains should not be fragmented to focus only on the closed access point without considering remaining access points"). Further, both ingress to and egress from the Property is available via North Main Street for northbound traffic.

Kosoco asserts that a material and substantial impairment of access is demonstrated by the fact that southbound traffic on North Main Street is now forced to travel several blocks to reach the Property. However, as noted by the supreme court in *TPLP Office Park Properties*, "[c]losing an access point and merely causing diversion of traffic or circuity of travel does not result in a

14

compensable taking." 218 S.W.3d at 66–67; *see also State v. Momin Props., Inc.*, 409 S.W.3d 1, 8–9 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding closure of access road at railroad tracks not compensable because closure merely required traffic to travel more circuitous route to reach gas station or cross railroad tracks); *State v. Bhalesha*, 273 S.W.3d 694, 698–99 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("A property owner cannot recover damages when traffic is merely required to travel a more circuitous route to reach his property."). Thus, the mere change in the circuity of travel for some of the traffic to the Property does not constitute a material and substantial impairment of access.

Further, difficult or inconvenient access during construction does not constitute a material and substantial impairment of access. *See State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 173 (Tex. 2009). Thus, the temporary closure of one of the roads abutting the Property during the construction of the North Line did not constitute a material and substantial impairment of access. Moreover, Kosoco's own representative, Namgoong, testified that there "were no complete 100 percent street closures" during construction.

Taking as true all evidence favorable to Kosoco, as the non-movant, and indulging every reasonable inference in its favor, we conclude that Kosoco has not stated a valid takings claim. *See Gen. Servs. Comm'n*, 39 S.W.3d at 599 (dismissing inverse-condemnation claim for want of jurisdiction because

15

allegations did not state takings claim).  Because Kosoco has not stated a valid takings claim, Metro, as a governmental entity, is immune from Kosoco's suit and the trial court had no subject matter jurisdiction over the suit.  *See Jones*, 8 S.W.3d at 638; *Guthrie*, 332 S.W.3d at 591–92.  Accordingly, we hold that the trial court did not err in dismissing, for lack of jurisdiction, Kosoco's claims for inverse condemnation.

We overrule Kosoco's first and second issues.

Having concluded that Kosoco has not alleged a valid takings claim, we do not reach its third issue, in which it argues that Metro is "constitutionally responsible for the acts of its contractors performing construction work" because it knew that certain "acts" would result in a "compensable denial of access to private property."  *See* TEX. R. APP. P. 47.1.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Brown.

16