

# In the
# Missouri Court of Appeals
# Western District

IN THE INTEREST OF: B.K.B.,     )
     )
     Juvenile;     )
     )
JUVENILE OFFICER,     )
     )     **WD86407**
     Respondent,     )     **OPINION FILED:**
     )     **FEBRUARY 20, 2024**
     v.     )
     )
D.M.G.,     )
     )
     Appellant.     )

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Jon E. Beetem, Judge**

**Before Division Two: Anthony Rex Gabbert, Presiding Judge, Karen King Mitchell, Judge, Janet Sutton, Judge**

D.M.G. ("Mother") appeals the circuit court's Judgment terminating her parental rights to B.K.B. ("Child"). Mother contends that, while there was substantial evidence that statutory grounds for termination of her parental rights existed by virtue of her lengthy addiction to drugs, frequent incarceration, and conviction for endangering Child's welfare, the circuit court abused its discretion in finding termination of Mother's parental rights to be in Child's best interest. We affirm.

## Factual and Procedural Background

In the light most favorable to the circuit court's Judgment, in 2014, Mother had six children removed from her care and placed in State custody. Mother's newborn child was born with drugs in her system, and Mother's home had drugs lying about and accessible to her children. Mother was provided services through the Children's Division prior to that time to prevent removal of the children. After the children were placed in foster care, it was discovered that Mother had sexually abused three of those children by perpetrating oral sex, sodomy, and other sexual abuse upon them, and having them watch her and a man engage in sexual relations. The youngest of the sexually abused children was only six years old and reported that Mother engaged in sexual intercourse with him. The children were made to perform oral sex on Mother's male friend.[1] For the following two and a half years, Mother was provided services to assist her in regaining custody of her six children. In May 2017, Mother's parental rights to those children were terminated.

Mother found out she was pregnant with Child in 2017. Mother was incarcerated in Dent County during some of that pregnancy. Mother then moved to Phelps County with Child's father ("Father")[2] and resided with a friend. Father was abusive to Mother

---

[1] It can be reasonably inferred from the record that, aside from the direct abuse and neglect Mother inflicted, her actions had a substantially detrimental, long lasting, and potentially far-reaching effect; the children acted out sexually against other children in foster care causing their removal from a family home setting and placement in residential treatment and group homes.

[2] Father's parental rights to Child were terminated in 2021. Father is not part of this appeal.

during the pregnancy. Mother testified that Father choked her, pulled her hair, and punched her in her kidney because he did not want her to have Child. Mother then moved away from Father and into her sister's home. Mother chose not to seek prenatal care for Child for fear the State would remove Child from her when Child was born. Mother smoked marijuana during the pregnancy. Mother considered having Child outside of Missouri, but ultimately chose a home birth with a "midwife" who had "handled some of her own deliveries."

Child was born in March 2018 when Mother was approximately thirty-four years old. The birth was difficult and at one point the midwife asked Mother if she wanted to go to the hospital. Child was born breech and did not cry immediately. Mother sought no medical care for Child. Child was three months old when Mother reunited with Father and moved to Cole County. Father's behaviors had not changed and Father beat Mother unconscious. When Mother recovered consciousness, Father and Child were gone. Mother testified that she reported to police that Father took Child, but since permanent custody had never been established, there was not much they could do. Mother never had Child's birth recorded.

Mother testified that Father was arrested when Child was six months old, but Mother was still unable to obtain Child because Father told police that his present girlfriend was Child's mother. Child remained in Father's home until after Child's first birthday. During the time Child was with Father, Mother also spent 120 days in prison.

Father, whom Mother testified was selling drugs, ultimately left Child to be cared for by Mother's friend.

Upon Mother's release from incarceration in April 2019, Mother reunited with Child. At that point, Mother had only had physical custody of Child for three months out of Child's thirteen months of life. Mother, Child, and Mother's friend resided in Cole County. Just four months later (August 2019), Child was taken into protective custody when authorities found her in a known drug house with drug needles lying about; Mother was not present. Child was seventeen months old. Child was dirty, smelled, and had no clothing that fit her. Child had bruising on her head, was very thin and small for her age, and speech delayed. Mother admitted to using methamphetamines while Child was in her care.

Mother was provided reunification services. Over the next two years, Mother was incarcerated nine separate times. The only task on Mother's reunification service plan that she complied with was writing letters to Child, but these stopped during times Mother was out of jail. Mother spent fifteen months in the Department of Corrections, but completed no programs geared toward reunification with Child. Mother continued to use drugs, even while incarcerated. Mother failed to pay child support (although one involuntary payment was withdrawn from her account in April 2021). Mother attended some family support team meetings, but only while incarcerated.

On June 2, 2021, Mother was released from prison. She was arrested in a drug bust in Cole County on June 11, 2021, and released again on June 15, 2021. In June and

4

July of 2021, Mother was offered visitation with Child.[3]  Mother was free from incarceration until August 14, 2021, and during this time Mother returned to drugs, made no effort to seek treatment, and made no effort to visit or reunify with Child.   The foster care case manager mailed letters to two addresses linked to Mother on June 11, 2021, and June 22, 2021, and mailed letters on July 20, 2021, to four possible addresses.  The mailings included the Family Support Team meeting date/time and Zoom information, visitation schedule, visitation guidelines, an updated Written Service Agreement, and Mother's attorney's contact information.  Mother never contacted anyone to facilitate reunification services or visitation.

A petition to terminate Mother's parental rights was filed August 25, 2021.  Child was nearly three and a half years old and had been in foster care for two years.  The petition alleged the following statutory grounds for termination of parental rights (sometimes referenced herein as "TPR"): Section 211.447.5(2)[4], alleging abuse and neglect of Child; Section 211.447.5(3), alleging Child had been under the jurisdiction of the Juvenile Court for more than one year and the conditions leading to the assumption of jurisdiction had not been remedied, with little likelihood of return to Mother in the near

---

[3] Although the record filed with this appeal does not contain any records regarding a March 2021 termination of parental rights hearing, Respondent's brief and the circuit court's June 2023 Judgment indicate that although Father's parental rights were terminated March 2021, the court did not terminate Mother's rights and Mother was given a continued opportunity to adjust her circumstances and reunify with Child.

[4] All statutory references are to the Revised Statutes of Missouri, as updated through 2022.  All rule references are to the Missouri Supreme Court Rules (2022).

future; and Section 211.447.5(5), alleging Mother unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse including, but not limited to, specific conditions directly relating to the parent child relationship of a duration or nature rendering the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of Child.

The circuit court entered Judgment on November 2, 2021, terminating Mother's parental rights upon finding Mother in default. Mother appealed. On November 16, 2022, this court issued its mandate reversing that Judgment, finding the circuit court had no authority to enter a default judgment against Mother and should have granted Mother's motion to set aside the Judgment. *Interest of B.K.B.*, 655 S.W.3d 16, 23-24 (Mo. App. 2022). We remanded the matter back to the circuit court for further proceedings. *Id.* at 24. Immediately thereafter, on November 23, 2022, the termination of parental rights hearing was scheduled for March 24, 2023, and later rescheduled for April 24, 2023.[5]

In May 2022 (six months after the initial termination of parental rights Judgment but prior to that Judgment being reversed on appeal), Mother was ordered into inpatient drug treatment as part of her probation. She then joined Healing House, a faith based sober living community, to complete substance abuse treatment. Child was nearly four

---

[5] An "Amended Petition for Termination of Parental Rights" was filed April 17, 2023, without objection. All alleged grounds for termination were the same as in the August 25, 2021 petition.

years old, and this was the first time in the nearly three years Child had been in foster care that Mother showed any sign of positively adjusting her circumstances. Mother continued to live at Healing House at the time of the TPR hearing.[6]

On November 23, 2022, the parties met for a Permanency Review Hearing. This hearing occurred immediately after this court reversed the first TPR Judgment, and the same day the TPR matter was set for trial. Following the Permanency Review Hearing, the circuit court found it in Child's best interest that adoption remain Child's permanency plan. The court found that reasonable efforts had previously been made by the Children's Division to facilitate reunification with Mother and that numerous services had been offered/provided. The court instructed the Children's Division to "undertake the actions necessary and provide services and evaluations to finalize the Permanency Plan" of adoption. The court additionally found that, "the existing social service agreement should continue." Although the permanency plan was adoption and the child was to remain in the legal and physical custody of Children's Division, the Children's Division was to resume providing efforts toward reunification. Visitation was to be "as agreed by"

_____

[6] Evidence at the TPR hearing showed that Mother's treatment at Healing House is intense and highly structured. She is required to be at work or the Healing House center during the day. In the evenings she has Healing House classes, other classes for her probation, GED classes, chore nights, or Alcoholics Anonymous. There is a mandatory 9:00 p.m. curfew. Mother is randomly drug tested and must meet with a mentor, AA partner, peer specialist, counselor, probation officer, attend church, and cannot be involved in a romantic relationship. At the time of the April 2023 TPR hearing, Mother was doing exceptionally well in the program, drug free, and in compliance with Written Service Agreement objectives.

the Children's Division, the Juvenile Office, and the Guardian ad Litem, and the Children's Division was to "get [a] therapist in place to provide guidance on progressing visitation in line with the child's best interest."

On January 25, 2023, a recommendation by a therapist with Counseling Associates in Columbia, Missouri was filed with the court. The therapist recommended against introducing Mother into Child's life at that time, noting that Mother and Child had no bond to strengthen and/or repair because Child does not remember any other family but the foster family. Further, that introducing Mother into Child's life would "confuse her young mind and disrupt the secure attachment to the only parent she knows, thus ensuring additional trauma."

The Family Support Team then sought a second therapist to guide any future introduction or visitation that might be appropriate. The second therapist met with Child in March 2023. The therapist testified that in a parent/child relationship, children need to feel safety and security, a bond of love, and know they can go to that person if hurt or scared. They need to know their basic needs are going to be met. A parent's history of stability, safety, bonding, and ability to provide are all factors taken into consideration when determining how to continue with a case. The therapist testified that these things cannot be assessed when a parent is living in the type of structured environment in which Mother remained. Some of the things that occurred when Child was in Mother's care that the therapist considered harmful included Child receiving no prenatal care, not being seen by a physician after delivery, and not being in a safe environment or properly clothed,

fed, loved and nurtured. The therapist took these things into consideration when determining risks to Child if placed in Mother's care.

The therapist testified that, because those initial harms had already occurred and cannot be undone, it would be imperative that Mother now be able to independently provide a mentally and physically safe environment. The therapist recommended against introducing Child to Mother at this time. In light of Mother's unstable history and the lack of an existing relationship between Mother and Child, the therapist discouraged introducing the two until Mother demonstrated she could maintain sobriety and handle the pressures of life after finishing her intensive treatment programs. The therapist testified that, when children are bonded to a parent, not seeing that parent is traumatic. But when there is no relationship, "then introducing someone they don't know, to have them relapse or not [be] able to fulfill what they had set out to do would traumatize a child." The therapist could not assess how long it would take Mother to demonstrate lasting stability or how long it would take after that to develop a strong enough relationship with Child for reunification to be possible.

The Family Support Team additionally asked the therapist to meet with Mother to gauge how long reunification might take if Mother continued to progress, and to also help Mother write letters to introduce herself to Child. The therapist emailed Mother on March 24, 2023, to schedule an appointment to meet with Mother and further assess the issue of visitation. Mother responded on April 12, the day following a Family Support Team meeting wherein Mother acknowledge having received the email. Despite the

9

therapist having identified herself in the email, Mother stated that her delayed response was because she was unaware of who the therapist was. The therapist and Mother never met.

A Social Summary Report dated April 6, 2023, discussed that Child was placed in her foster home shortly after removal from Mother and has remained in that home ever since. Child adjusted well to the home and quickly became attached to the foster parents, initially crying when they would leave her sight if they had to go to another room or when they dropped her off at daycare. Child identifies the foster family as her own family and has no recollection of Mother. Child is bonded to her foster family, as they are to her, and is well adjusted. The foster parents intend to adopt Child if she becomes available for adoption. The foster parents have one biological child who also resides in the home.

Child talks in full sentences and does well at learning new things. Child manages well academically but struggles with social and emotional behaviors. Child "is always on the go," is "hyperactive," and uses a weighted blanket to help with staying in place. Child is easily distracted but does well with consistency and routine. The foster family has worked closely with professionals to address Child's physical, social, emotional, and educational needs.

The circuit court entered its "Amended Judgment Terminating Parental Rights" on June 6, 2023, terminating Mother's parental rights on three separate statutory grounds and finding termination in Child's best interest. This appeal follows.

**Standard of Review**

To terminate parental rights, the circuit court must find at least one statutory ground for termination supported by clear, cogent, and convincing evidence, and find termination is in the best interests of the child by a preponderance of the evidence. *See* § 211.447; *In re B.H.*, 348 S.W.3d 770, 772 (Mo. banc 2011) (internal citation omitted); *In re A.M.S.,* 272 S.W.3d 305, 308 (Mo. App. 2008). "Clear, cogent, and convincing evidence" is that which "instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004). "'Preponderance of the evidence' is defined as that degree of evidence that is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not." *C.L. v. Hartl*, 495 S.W.3d 241, 243 (Mo. App. 2016) (internal quotation marks and citation omitted).

Upon review, we must affirm the circuit court's judgment "unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law." *In re K.A.W.,* 133 S.W.3d at 11. We review any conflicting evidence in the light most favorable to the circuit court's judgment, and defer to the circuit court's judgment on factual issues such as the credibility of witnesses. *Id.* at 11–12. "When the trial court finds multiple statutory grounds for termination of parental rights, in order to affirm the judgment this court need only

11

find that one of the statutory bases was proven[.]" *In Re T.R.W.,* 317 S.W.3d 167, 170 (Mo. App. 2010) (internal quotation marks and citation omitted).

After we determine that one or more statutory ground has been proven by clear, convincing, and cogent evidence, we must consider whether termination of parental rights was in the best interest of the child. *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 626 (Mo. banc 2014). "At the trial level, the standard of proof for this best interest inquiry is a preponderance of the evidence; on appeal, the standard of review is abuse of discretion." *Id.* A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and so unreasonable and arbitrary so as to shock the sense of justice and indicate a lack of careful, deliberate consideration. *In Interest of J.P.B.*, 509 S.W.3d 84, 96 (Mo. banc 2017). "If reasonable minds can differ about the propriety of the trial court's ruling, there was no abuse of discretion." *Interest of J.G.W.*, 613 S.W.3d 474, 479 (Mo. App. 2020) (internal quotation marks and citation omitted).

### Point on Appeal

In Mother's sole point on appeal, she contends the circuit court abused its discretion in finding termination of Mother's parental rights to be in Child's best interest. Mother contends that, while there was substantial evidence that statutory grounds for termination existed by virtue of Mother's lengthy addiction to drugs, frequent incarceration, and conviction for endangering Child's welfare, termination was not in Child's best interest "because upon the promise of reunification efforts ordered by the court" Mother has recently complied with reunification services "while pursuing the

12

possibility of progressive visitation as ordered," but was denied visitation thereby eliminating Mother's chance of establishing a beneficial relationship with Child. Mother argues that "there was no evident intention that that order would ever be followed because at all times the child was denied any visitation with Mother such that whatever chance the child may have had to have a beneficial relationship with Mother was eliminated at the outset." We find no abuse of discretion.

In determining termination of Mother's parental rights to be in the best interest of Child, the circuit court made extensive findings on the best interest factors set forth in Section 211.447.7. The court found:

a. The child has no emotional ties to Mother, as the child was removed from Mother's care as an infant and Mother did not maintain sufficient contact with the child or the case worker to support a relationship with the child.

b. Mother did not exercise visitation with the child when it was offered during her periods out of prison, and she did not consistently write letters.

c. Mother has not financially supported the child for the pendency of this case, until she began making payments in December 2022.

d. Additional services would not likely bring about lasting parental adjustment enabling the child to return to Mother within an ascertainable period of time due to Mother's long absence and failure to adjust her circumstances over three years in this case.

e. Notwithstanding the fact that she prevailed on the first attempt at terminating her parental rights in March of 2021, Mother made no efforts at building a relationship with her child.

f. Mother began showing interest and commitment to the child only after her parental rights were terminated in November of 2021 and she won her appeal on procedural grounds, but demonstrated no commitment to the child prior to the termination of her rights.

13

g. Mother has five felony convictions and is on supervision for four of those convictions with a sentence expiration of November 2028. She has a history of probation and parole revocations, which could deprive the child of a stable home for a period of years.

h. Mother committed deliberate acts that subjected the child to a substantial risk of physical or mental harm. (Referencing, among other things, Mother's sexual abuse of three biological children; Mother's 2022 conviction of child endangerment regarding Child; Mother's failure to maintain a relationship with Child despite having the opportunity for more than two years; Mother's failure to benefit from reunification services provided regarding her other children from 2013 to 2017; Mother's failure to provide proper care to Child when child was in her custody from 2018 to 2019; Mother's criminal history and probation/parole violation history that has kept her in and out of jail since 2014 without significant periods of stability in the community.)

i. It would subject the child to psychological trauma to uproot her from the only home and family she can remember and return her to a parent she does not know. The therapist testified that the child would likely be traumatized by the reunification process since she does not know or have any relationship with Mother at this time—a condition directly resulting from Mother's lack of participation and choices that caused her repeated incarceration during this case.

"A finding that termination is in the child's best interest is a subjective assessment based on the totality of the circumstances." *Interest of A.M.W.*, 652 S.W.3d 225, 244 (Mo. App. 2022) (internal quotation marks and citation omitted). "We defer to the trial court's factual findings and credibility determination and do not reweigh the evidence." *Id.* "There is no requirement, statutory or otherwise, that all [best interest] factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination." *Id.* (internal quotation marks and citations omitted).

14

The circuit court's findings regarding the best interest factors are supported by substantial evidence. During the first three months of Child's life, Mother subjected Child to a home with brutal domestic violence and harmful drugs. Child was then taken from Mother by the man who punched Mother (because he did not want Child to be born), and beat Mother unconscious. Although Mother deliberately concealed Child's birth to prevent Child from being removed from her custody, instead of providing Child a safe delivery into the world, medical care thereafter, and a safe home environment, Mother placed Child in the care of a man she knew to be violent. Because Mother hid Child from authorities and never established a record of Child's birth, Mother was unable to retrieve Child from that man (Father) or prove that she was Child's mother and retrieve Child when Father went to jail. After Child was removed from Mother's care by the State, Mother waited nearly three years to begin to improve her circumstances and attempt a relationship with Child.

The circuit court articulately and accurately assessed that Mother, and Mother alone, prevented Child from developing a relationship with Mother.[7] This lack of relationship, and the fact that Mother still has yet to prove that she can care for herself outside of a structured environment, much less put the needs of a helpless and dependent child above her own, reasonably resulted in Child not being subjected to visitation with

---

[7] Mother concedes that, at the time of the TPR hearing, four out of the five years of the Child's life, Mother herself deprived Child of the ability to establish a parent/child relationship with Mother. Mother states: "No one will argue that until June, 2022, Mother was not someone a little child should get to know."

Mother until such things could be proven. The fact that Mother could potentially prove these things at some point in the future does not negate that three separate statutory grounds were proven to support termination of Mother's parental rights, and that Child's best interests dictate physical and emotional safety and stability, continuity of care, and permanency.

Mother argues that her past history and the therapist's conclusions could/should not have been the decisive factors in this termination matter or the parties would not have invested time and energy in "performing what can only be characterized as a mere charade." Mother states:

> For seven months, they had Mother do all of these things knowing that all of it was futile because all along they weren't going to let the child see Mother anyway. They could not have imagined that Mother was doing these things with an expectation to not see the child. In fact, a chance to see her child was the only reason she did it all, and everyone knew that.[8] Yet the outcome turned out to be the decidedly unfunny punchline of a long and very sick joke.

Mother argues that the court's November 23, 2022, Permanency Review Hearing Order "was ignored such that no visitation guidance was ever rendered" and, consequently, the "court was simply not fully informed to exercise discretion as to whether termination was in the child's best interests," resulting in the court's best interest decision being an abuse of discretion.

---

[8] Pursuant to Section 211.447.8, "It is irrelevant in a termination proceeding that the maintenance of the parent-child relationship may serve as an inducement for the parent's rehabilitation."

First, the court's orders regarding visitation were not ignored. Mother was not guaranteed visitation in the November 23, 2022, Permanency Review Hearing Order and, given the case history and the fact that all permanency planning review hearing orders are to be guided by the best interests of the child, it would be shocking if the court had made such an order. At the time of the November 23, 2022, permanency review hearing, all parties knew that a termination of parental rights petition was pending. Following the review hearing, the court found adoption to be the permanency plan in the best interest of the child, and visitation "as agreed by CD/JO/GAL." The Children's Division was to "get therapist in place to provide guidance on progressing visitation in line with the child's best interest." Two therapists ultimately provided that guidance, both concluding that it was not in Child's best interest to meet a mother who waited years to attempt to establish a relationship with Child, although given the opportunity, and who had not yet proven that her recent stability could be ongoing in a less structured setting.

Second, Mother cannot reasonably believe that the order for reunification services in the November 23, 2022, Permanency Review Hearing Order was a guarantee that her parental rights would not be terminated simply if she complied with services, or that she would receive visitation with Child.

After a child is removed from a parent, the Children's Division is required to engage in reasonable efforts "to make it possible for the child to return home." § 211.183.1. "Reasonable efforts" are defined as "the exercise of reasonable diligence and care by the division to utilize all available services related to meeting the needs of the

17

juvenile and family." § 211.183.2. "In determining reasonable efforts to be made and in making such reasonable efforts, the child's present and ongoing health and safety shall be the paramount consideration." *Id.* Pursuant to Section 211.183.9, the Children's Division may "*concurrently* engage in reasonable efforts [for reunification] while [also] engaging in such other measures as are deemed appropriate by the division to establish a permanent placement for the child." (Emphasis added).[9]

Pursuant to Section 210.720 (and Rules 124.01.b(2) and 124.09), permanency hearings are required every twelve months and,

> shall be for the purpose of determining in accordance with the best interests of the child a permanent plan for the placement of the child, including whether or not the child should be continued in foster care or whether the child should be returned to a parent, guardian or relative, or whether or not proceedings should be instituted by either the juvenile officer or the division to terminate parental rights and legally free such child for adoption.

§ 210.720.1. In such hearings, the court is required to consider all relevant factors, including but not limited to: 1) the interaction and interrelationship of the child with the child's foster parents, parents, siblings, and any other person who may significantly affect the child's best interests, 2) the child's adjustment to his or her foster home, school, and community, 3) the mental and physical health of all individuals involved, including any history of abuse of any individuals involved, 4) and the needs of the child for a

---

[9] The circuit court consistently found throughout the duration of the case that the Children's Division made reasonable efforts to reunify Child with Mother; Mother never challenged those findings.

18

continuing relationship with the child's parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child. § 210.720.2.

Pursuant to Section 210.730 (and Rules 124.01.b(3) and 124.10), permanency review hearings are required at least every six months while the child remains in the custody of the Children's Division. The court is required "to determine and, in accordance with the best interests of the juvenile, order" "the permanency plan that is most appropriate for the juvenile" and "the reasonable efforts required of the children's division to finalize the permanency plan that is most appropriate for the juvenile." Rule 124.10.c(4). Even where reunification with a parent is not the permanency plan, the court must "continue or, as appropriate, modify the social service plan and any court-ordered services."[10] Rule 124.10.c(2).

Here, on October 13, 2021 (just prior to the November 2021 initial Judgment of termination that was ultimately reversed by this court), the circuit court's Permanency Hearing Order stated that the permanency plan for Child was "TPR/Adoption." The Children's Division was ordered to "complete the TPR referral to the Juvenile Officer within 45 days of the date of this order." Nevertheless, the Children's Division was

---

[10] Pursuant to Section 210.147.2, at the conclusion of any team meeting held in relation to a child removed from the home and placed in the custody of the State, a signed document must be provided by the Children's Division that is consistent with service agreements or case plans required by statute, and is to address such things as whether the child will remain in current placement or be moved, and visitation with the child's family.

required to concurrently "provide efforts toward reunification" and "Visitation: as agreed by CD/JO/GAL."

On April 6, 2022 (five months *after* the default TPR Judgment and prior to reversal of that Judgment on appeal), the circuit court entered a Permanency Hearing Order. The order found that the permanency plan was adoption, with the Children's Division to concurrently provide efforts toward reunification, and visitation "as agreed by CD/JO/GAL." The same was ordered following the permanency review hearing held April 20, 2022.

The Children's Division was not relieved of making reasonable efforts for reunification until the circuit court's August 24, 2022, Permanency Hearing Order entered nine months after Mother's parental rights were terminated but while that Judgment was pending appeal.[11]

Immediately after this court reversed the circuit court's November 2021 termination Judgment, a November 23, 2022 permanency review hearing was held. Following that hearing, the circuit court ordered that the permanency plan continue as adoption, but reinstated its requirement that the Children's Division concurrently provide efforts toward reunification.

---

[11] Mother states in her Reply Brief: "There is no requirement that a juvenile court order reunification efforts once a permanency plan is for TRP [sic] and adoption." Of note, Section 211.183.7(3) states that the Children's Division shall not be required to make reasonable efforts if a court of competent jurisdiction has determined that the parent's parental rights to a sibling have been involuntarily terminated.

Moreover, of the more than three years Child was in foster care, there were only three months where the Children's Division was *not* ordered to provide reunification services. Consequently, the court's November 2022 order to the Children's Division to provide reunification services, despite the permanency goal being adoption, was nothing new to Mother. While the services were a benefit to Mother in the event the Juvenile Officer was unable to prove the termination of parental rights petition, the court's order was not a promise of reunification or visitation.

Mother suggests that the court's best interest analysis should have disregarded her past history in favor of her recent successes. This is not consistent with settled precedent. "The conclusion that termination is in the child's best interests cannot, as a practical matter, be based upon considerations wholly separate from those establishing a ground for termination." *In Interest of R.H.S.*, 737 S.W.2d 227, 236 (Mo. App. 1987) (internal quotation marks and citation omitted).

> An essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking into the future, the child would be harmed by a continued relationship with the parent. A prospective analysis is required to determine whether grounds exist and what is in the best interests of the child for the reasonably foreseeable future. Obviously, it is difficult to predict the future. Section 211.447 provides for detailed consideration of the parent's past conduct as well as the parent's conduct following the trial court's assumption of jurisdiction as good evidence of future behavior.

*In re K.A.W.*, 133 S.W.3d at 9.

Despite Mother's recent improvements, the court was justified in not ignoring Mother's extensive history of child abuse, neglect, and failure to rectify when considering

21

Child's best interests. Mother does not dispute the circuit court's finding under Section 211.447.5(2) that "Mother has committed severe or recurrent acts of sexual abuse toward children in the family and also knew or should have known that such acts were being committed by another." Our legislature has dictated that children should not be returned to the custody of a parent who has sexually abused a child. Under Section 210.117.1(3) and 211.038.1(3), a child taken into State custody "shall not be reunited with a parent" if that parent is found guilty of abuse of a child under Section 568.060 when the abuse was sexual in nature. While Mother was never charged with these crimes, and Mother suggested at trial that her children might have confused her with a sister, the Children's Division determined from credible evidence that Mother inflicted the abuse.

Given Mother's history of abusing and neglecting seven different children, and the many layers of concerning issues extant in this case, sober and independent living is just the tip of the iceberg in Mother proving her ability and fitness to parent Child.[12] The court accurately concluded, and Mother concedes by not disputing the court's findings under Section 211.447.5(5), that Mother is unable in the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of Child. The court did not abuse its discretion in concluding that it is not in Child's best interest to

---

[12] Child's Court Appointed Special Advocate testified at trial that Written Service Agreements are designed to accommodate current circumstances with attainable goals, and once those goals are met, additional goals are added so that circumstances continue to improve. The fact that Mother was finally compliant with the terms set forth on her Written Service Agreement did not demonstrate that she was ready to take care of Child.

wait any longer for permanency when Mother was given years to reunify and establish a relationship with Child and failed to do so.

Finally, Mother argues that termination of her parental rights was not in Child's best interests because awarding guardianship of Child to the foster parents, such that Mother could continue to pursue a relationship with Child, was in Child's best interests instead. We disagree.

Pursuant to Section 211.477.4(3), if the court finds that one or more of the grounds set out in Section 211.447 exists, but that termination is not in the child's best interests "because the child would benefit from the continued parent-child relationship … the court may: … (3) Appoint a guardian under Chapter 475." The evidence at trial was that Child would not benefit from a relationship with Mother. Because of Mother's own actions, Child is five years old and has no relationship with Mother. Any personal relationship between Mother and Child at this point would be commencing, not continuing.

Stability and permanency for foster care children, as dictated by the child's best interests, is statutorily mandated. § 210.564. While guardianship may very well be the most appropriate permanency plan for some children in State custody, guardianship here would not provide permanency in this child's best interests because it would deprive her of the opportunity to be adopted by her foster parents, and would subject her and the

23

foster parents to ongoing future litigation.[13]  Mother could continue to pursue visitation and custody from the foster parents for years to come despite Mother never establishing a relationship with Child.

Mother's point on appeal is denied.

## Conclusion

The circuit court did not abuse its discretion in concluding that termination of Mother's parental rights was in Child's best interest.

The circuit court's Judgment is affirmed.

_____
Anthony Rex Gabbert, Judge

All concur.

---

[13] A guardianship under chapter 475, RSMo, is not a permanent severance of the relationship between a parent and a child.  *In re E.R.V.A.*, 637 S.W.3d 100, 108 (Mo. App. 2021).  "Instead, the granting of letters of a minor is done as a stop-gap measure to provide care and custody of a minor for the period of time when the natural guardian-parent is unable, unwilling, or unfit to perform this parental function."  *Id.*  (internal quotation marks and citation omitted).