

# In the Missouri Court of Appeals
## Eastern District

DIVISION THREE

|  |  |
|---|---|
| IN THE INTEREST OF L.M.S. & L.S.S., Minors. | Nos. ED112602 and ED112603 |
|  | Appeals from the Circuit Court of St. Louis County |
|  | Cause Nos. 23SL-JU00044, 23SL-JU00045 |
|  | Honorable Jason D. Dodson |
|  | Filed: March 18, 2025 |

Introduction

Appellant (Mother) appeals the trial court's judgments terminating her parental rights to L.M.S. and L.S.S.[1]  We affirm.

Background

L.M.S. was born on January 18, 2020, and L.S.S. was born June 27, 2021.  L.S.S. tested positive at birth for the presence of amphetamines and methamphetamines in the umbilical cord, and Mother tested positive for the presence of amphetamines in her urine

---

[1] After a consolidated hearing concerning both children, the trial court entered separate judgments for each child containing identical findings related to Mother and terminating Mother's parental rights on the same grounds for each child.  The trial court's judgment concerning L.S.S. also terminated the parental rights of John Doe, the unknown natural father of L.S.S., and the trial court's judgment concerning L.M.S. also terminated the parental rights of her natural father (Father).  Father is not a party to this appeal.  Because the relevant findings of the trial court concerning Mother's relationship with both children are identical in both judgments, and the appeals of each order are consolidated here, we consolidate our review accordingly and discuss the findings related to both children together.

from tests conducted on or about June 27, 2021. In July of 2021, Children's Division took both children into protective custody, and the trial court adjudicated both children abused or neglected on October 5, 2021, due to the aforementioned circumstances at L.S.S.'s birth and because L.M.S. is L.S.S.'s sibling and was a member of the same household as L.S.S., Mother, and L.M.S.'s Father.

On January 10, 2023, Children's Division filed the underlying petitions to terminate Mother's parental rights to these two children. In August of 2023, the trial court held a termination of parental rights (TPR) hearing on the petitions, at which the trial court heard the following evidence relevant to this appeal. The trial court took judicial notice of prior court cases involving Mother: in December of 2007, Mother had pled guilty to involuntary manslaughter and first-degree endangering the welfare of a child; in 2012, Mother lost custody to two of her other children due to domestic violence in the home; in 2022, Father pled guilty to four counts of domestic violence against Mother; and in 2021 and 2022, Mother and Father pled guilty to various counts of tampering with a vehicle. The children's case manager (Case Manager) testified that at the time the children came into protective custody, both Mother and Father had pending criminal charges and were wanted by law enforcement.

At the time of the trial court's adjudication of abuse and neglect in October of 2021, the trial court had ordered Mother to participate in services to accomplish reunification. These included supervised visits with the children, participating in individual counseling and substance abuse treatment, completing a psychological evaluation and parenting assessment and complying with any resulting recommendations, and undergoing drug

screens as requested by Children's Division. Case Manager also testified that Mother did not have stable housing.

Case Manager testified regarding Mother's progress on her reunification efforts. Mother was employed in various jobs during the pendency of this care and protection case, but she was not able to obtain stable housing. Mother testified she was not employed at the time of the TPR hearing. While she was employed, she testified she contributed $60 per month for child support, which was garnished from her wages. She attended most, but not all, family support team meetings at which they discussed the time frame for Mother to complete services and accomplish reunification. Mother was aware of the requested services and what to do to complete them, but at the time of the TPR hearing, she had not completed the recommendations.

Regarding Mother's random drug screens, she had "quite a few no-shows," and she understood that a no-show would be considered a positive drug result. Mother also completed a substance abuse assessment and attended some sessions for substance abuse treatment, but she was terminated from the program due to noncompliance with attendance. She was later referred to a different substance abuse treatment program and had some visits with that program, but to the Case Manager's knowledge, Mother did not successfully complete the program.

Case Manager referred Mother for individual therapy, but Mother did not participate in or complete any individual therapy through Children's Division. Mother completed a psychological evaluation and parenting assessment, and Case Manager provided Mother with referrals so that she could complete the resulting recommendations. She scored low on her initial pretest for parenting classes, and in May through August of

2022, she attended some classes, but not consistently, arriving late or leaving early for some of the sessions she did attend.

Case Manager testified that during the time Mother was working on her parenting classes, she did not request any visitation with the children, and she had not requested any since October of 2022. Mother also acknowledged that between December of 2021 and April of 2022 she did not communicate at all with the Children's Division. Case Manager told Mother in May of 2022 that she could not see the children until she had completed a hair follicle test and three consecutive clean drug screens. Case Manager testified that was because Mother had had no contact with Case Manager, there were prior criminal charges, and Mother was inconsistent with the services in place. Mother sent cards, letters, and gifts to the children between November of 2022 and June of 2023. As of the hearing date in August of 2023, Case Manager did not believe the children had emotional ties to Mother, as they had not seen her regularly since 2021.

Case Manager believed the harmful conditions that brought the children into care continued to exist at the time of the hearing, in that Mother had not obtained housing or addressed her chemical dependency, and she still had outstanding criminal issues. Case Manager observed little activity or compliance with the services provided. Case Manager contacted Mother's current and previous probation officers to discern whether Mother was completing services related to probation and to minimize overlap, but Mother did not respond to Case Manager's efforts to get Mother to sign a release form for that information.

Mother testified that she had been in an outpatient program for substance abuse for about four months, until it was discontinued a month before the TPR hearing, when Mother turned herself in for outstanding warrants. Mother testified her probation officer was

attempting to get her back into that program. She admitted she had an alcohol problem and stated that if she was tested that day, it would be positive for alcohol. She testified she signed a release with her probation officer for information about her substance abuse program with Children's Division, but she was not aware she needed to sign a form with Children's Division. Mother testified she refused the hair follicle test because she previously had a faulty test with Children's Division in cases involving her older children, and she did not want to risk that again. Mother also testified she had proof of completed drug screens for her probation officer, but it was in her vehicle that was impounded in June of 2023. She asked the trial court for more time to obtain this proof to show the trial court and to complete services. Mother believed she could make significant progress if given six months.

Mother also testified she initially attended individual counseling, but her counselor went on maternity leave and she was never reassigned to anyone. Mother was seeing a counselor at the time of the hearing, and she felt she would be successful in that program. She also testified about the domestic violence toward her from Father. She stated she was not currently with Father and planned to have no future contact with him.

The children's guardian ad litem (GAL) testified that she believed it was in the children's best interests for the court to grant the request for TPR. Case Manager had testified that L.S.S. was receiving treatment and therapy resulting from drug exposure at birth, and L.M.S. was receiving care for fears she had related to men. Both children were doing well in a foster, pre-adoptive home.

In February of 2024, the trial court reopened evidence on the case. Case Manager testified that Mother had contacted Case Manager via text in October of 2023 and indicated

5

she was going to attempt to complete services. She also told Case Manager she was planning to be at the November 2023 permanency review hearing, and Mother was present for that hearing. Mother also signed a release and Case Manager contacted Mother's probation officer, who told Case Manager that Mother was in an outpatient substance abuse program, but she does not regularly attend. Case Manager testified the probation officer did not provide any information regarding drug screens, and Mother had not released that information. Since the prior hearing in August of 2023, Mother had not completed any additional services through Children's Division. Additionally, Mother had not requested any visits with the children or sent anything to them since the previous hearing. Case Manager believed Mother had shown a continued lack of commitment and disinterest in her children.

The children's GAL testified that she continued to believe it was in the children's best interests to grant the TPR. She believed the children had no bond with either parent, and the parents had not engaged in regular contact with the children or contributed in any significant amount to the cost of care for the children. The GAL did not believe that additional services would bring about an ability to return the children in an ascertainable period of time because the parents had not engaged in the services that have been offered already.

On February 23 and 26, 2024, the trial court entered its TPR judgments for the children, finding three of the statutory grounds listed in Section 211.447.5[2]: abuse and neglect, failure to rectify, and unfitness. The trial court also found that termination was in the best interests of the children pursuant to Section 211.447.7.

---

[2] All statutory references are to RSMo. Supp. 2023, unless otherwise indicated.

6

<u>Discussion</u>

Mother raises four points on appeal. In her first three points, she argues the trial court erred in terminating her parental rights on each of the three statutory grounds relied on by the trial court. In her fourth point, she argues the trial court erred in finding termination was in the best interests of the children pursuant to Section 211.447.7.

<u>Standard of Review</u>

In a case terminating a party's parental rights, we review "whether clear, cogent, and convincing evidence was presented to support a statutory ground for terminating parental rights under <u>Murphy v. Carron</u>, 536 S.W.2d 30 (Mo. banc 1976). Therefore, the trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." <u>J.A.R.</u> <u>v. D.G.R.</u>, 426 S.W.3d 624, 626 (Mo. banc 2014) (quoting <u>In re Adoption of C.M.B.R.</u>, 332 S.W.3d 793, 815-16 (Mo. banc 2011)). We view the evidence in the light most favorable to the judgment, and we defer to the trial court's credibility determinations. <u>Id.</u> Once this Court determines that at least one statutory ground has been proven by clear, convincing, and cogent evidence, we then ask whether termination was in the best interests of the child. <u>Id.</u> We review the trial court's determination regarding the child's best interests for an abuse of discretion. <u>Id.</u> We are mindful of the late Judge Teitelman's description of termination of parental rights as "tantamount to a civil death penalty," and we somberly undertake our review in this light. <u>See</u> <u>In re K.A.W.</u>, 133 S.W.3d 1, 12 (Mo. banc 2004) (quoting <u>In re N.R.C.</u>, 94 S.W.3d 799, 811 (Tex. App. Houston 14th Dist. 2002)).

<u>Failure to Rectify</u>

7

In Point II, Mother argues the trial court erred in terminating Mother's parental rights to the children based on the statutory ground of failure to rectify because the record lacked clear, cogent, and convincing evidence of the statutory factors. We disagree.

Clear, cogent, and convincing evidence is "evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the trier of fact is left with an abiding conviction that the evidence is true." In re S.Y.B.G., 443 S.W.3d 56, 59 (Mo. App. E.D. 2014). In determining whether to terminate parental rights for failure to rectify under Section 211.447.5(3), the trial court must find that the child has been under the jurisdiction of the juvenile court for a period of one year, and at least one of the following:

> The conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

It is undisputed here that the children have been under the jurisdiction of the juvenile court for more than one year. Further, the trial court found that the neglect or abuse conditions that led to the assumption of jurisdiction persist, that conditions of a potentially harmful nature continue to exist, and that the continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home.

In coming to these conclusions, the court must consider and make findings on the following factors:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

These statutory factors "are not separate grounds for termination by themselves, but rather categories of evidence that the court may consider along with all other relevant evidence in determining whether grounds for termination exist under Section 211.447.5(3)." Interest of A.O.B., 666 S.W.3d 295, 301 (Mo. App. E.D. 2023) (quoting Interest of K.A.M.L., 644 S.W.3d 14, 23 (Mo. App. E.D. 2022)) (internal citation and quotations omitted). Though the court must make findings on all four factors, "evidence supporting just one factor is sufficient to terminate parental rights." Id.

Here, the trial court made findings on all four factors and found clear, cogent, and convincing evidence that three of them supported termination.

Regarding subsection (a), the terms of a social service plan and the extent to which Mother has made progress in complying with those terms, Mother initially argues that there was no written service plan between Mother and Children's Division. The trial court found Mother failed to sign a service plan. However, Case Manager testified that she mailed the

9

written service plan to Mother. Mother also attended family support team meetings and trial court permanency review hearings at which the details of the service plan were discussed, and Case Manager testified that Mother understood the requirements as well as the timeline for reunification. The fact that Mother did initially undertake some services as well as ask for more time to complete the requirements at the trial court's first TPR hearing date show that despite not signing the service plan, Mother was aware of it and its terms.

Mother does not dispute the terms of the service plan, which the trial court found included attending supervised visits with the children, obtaining and maintaining suitable housing, obtaining and maintaining stable employment, initiating and participating in individual counseling until successfully discharged, participating in substance abuse treatment and random drug screens, participating in a parent education program, psychological evaluation, and parenting assessment, and complying with all recommendations. The court found Mother failed on a continuing basis to comply with the requirements or to demonstrate an intent to provide for her children's continuing care.

Mother argues that she completed a psychological evaluation and parenting assessment, a drug assessment, some parenting classes, some individual counseling through Community Reach, and she was participating in a substance abuse program at Gateway through her probation officer. She also argues that she had completed drug tests through her probation officer as well.

Case Manager confirmed Mother had completed a psychological evaluation and parenting assessment, as well as some parenting classes, but that her attendance was not consistent and she was ultimately discharged from the program due to lack of attendance.

10

She did not participate in drug testing as requested by the Children's Division, and had "quite a few no-shows," which she knew would count as positive drug tests. Mother had not obtained stable housing even as of the trial court's second TPR hearing date, in February of 2024. She also did not have stable employment. The evidence was mixed regarding her substance abuse treatment, given that her probation officer only confirmed that she was participating in an outpatient program through Gateway at the time of the second TPR hearing date, but did not confirm individual counseling or drug test results. Thus, while the evidence shows Mother took initial action in participating in services requested by Children's Division, she did not follow through with treatment or resulting recommendations in any significant way toward completion of parenting education, counseling, or substance abuse treatment.

Further, as it relates to the children, Case Manager testified Mother did not attend regular supervised visits or set them up through One Hope United, the agency overseeing visits and parenting education. She was not consistent in communicating with Children's Division and frequently did not respond to contact from Case Manager. She had not seen the children for over a year at the time of the second TPR hearing date.[3] Substantial evidence supports the trial court's finding that Mother failed on a continuing basis to comply with the requirements regarding court-ordered services.

Regarding subsection (b), the success or failure of the efforts of the juvenile officer, the division or other agency to aid Mother on a continuing basis in adjusting her

---

[3] The trial court found Mother had not visited the children since May of 2022. Case Manager testified Mother had not contacted the Children's Division between December of 2021 through April of 2022, which in part was why Case Manager told her in May of 2022 that she could not see the children until completing the requested drug screens. Case Manager further testified Mother did not request visits while attending parenting classes from May through August of 2022, and that she did not request any visits after October of 2022.

circumstances or conduct to provide a proper home for the child, Mother argues she was hindered by the Children's Division for two reasons: (1) Case Manager told her she could not see the children until she had a hair follicle drug screen and completed three consecutive clean drug screens, and (2) the Children's Division contacted Mother's probation officer but failed to obtain drug screen results. The trial court found that the Children's Division provided continuing and diligent efforts to engage Mother in services, which proved unsuccessful.

Case Manager acknowledged saying that Mother could not see the children until she completed a hair follicle test and three clean drug screens, but Case Manager testified this was because Mother had not been in contact with Children's Division for several months, she had been inconsistent with the services provided, and she had prior criminal charges. Mother exhibited a lack of interest in visiting the children prior to this statement by Case Manager, and Mother frequently did not respond when Case Manager attempted to contact her. Further, when Case Manager referred Mother to One Hope United to arrange visits, Mother did not contact them. The evidence shows she had not visited the children in over a year prior to the trial court's TPR judgment.

Case Manager also testified she spoke with Mother's probation officer, but Mother had not signed release forms enabling her to get information regarding any drug screens. The probation officer informed Case Manager only that Mother was participating in a substance abuse treatment program through Gateway, and that sometimes her attendance was not regular. Case Manager testified she contacted Mother about getting the authorizations, but Mother was not responding to Case Manager's attempts to contact her.

The trial court's findings reflect that it found Case Manager's testimony credible, and this testimony supports the trial court's conclusion that the Children's Division made continuous efforts to provide services toward reunification, and Mother did not adjust her circumstances or conduct to provide a proper home for the children.

Regarding subsection (c), a mental condition that renders the parent unable to knowingly provide the child the necessary care, custody and control, the parties agree with the trial court's finding that there was no evidence Mother suffers from such a condition.

Regarding (d), a chemical dependency that prevents the parent from consistently providing the necessary care, custody, and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody, and control, Mother argues the trial court erred in finding she suffered from such a chemical dependency, due to the evidence Mother was participating in an outpatient drug program through Gateway and her testimony that she was completing drug screens through her probation officer. She also argues there was no evidence she was using any illegal substances at the time of the TPR hearing.

The trial court found that Mother suffers from a chemical dependency, and she had failed to complete substance abuse treatment or drug screens. The trial court noted Mother is attending Gateway outpatient treatment, but that she does not always attend. Substantial evidence supports these findings in that Case Manager testified Mother's probation officer confirmed her participation in Gateway's program, but stated her attendance was not always regular. There was no confirmation of any drug screens, and Case Manager testified in February of 2024 that Mother's probation officer did not share that information because Mother had not signed releases for it. Mother acknowledged she did not complete

13

regular drug screens through the Children's Division, and she did not provide proof of screens completed as part of her probation.[4] Further, Mother acknowledged a problem with alcohol at the TPR hearing in August of 2023, and she testified that if she had been tested that day, it would have been positive for alcohol. Because of her lack of submission to drug or alcohol testing, there was no evidence as to whether her alcohol dependence or any other drug use[5] continued as of the date of the trial court's TPR judgment. The clear evidence showed there was no successful completion of any treatment program as of that date.

In light of the court's findings of clear, cogent, and convincing evidence on each of these factors, all supported by substantial evidence in the record, we conclude the trial court did not err in terminating Mother's parental rights due to failure to rectify under Section 211.447.5(3). As such, we need not consider the other statutory grounds for relief. See J.A.R. v. D.G.R., 426 S.W.3d at 626; In re S.R.J., Jr., 250 S.W.3d 402, 407 (Mo. App. E.D. 2008) (noting court must find clear, cogent, and convincing evidence of only one statutory ground, plus whether termination is in best interests of child, to uphold termination). Accordingly, Points I, II, and III are denied.

Best Interests of the Children

In her final point, Mother argues the trial court abused its discretion in finding that TPR was in the best interests of the children. We disagree.

Section 211.447.7 requires the court to consider seven factors in its determination of whether terminating Mother's parental rights is in the best interests of the children:

---

[4] Mother had testified in August of 2023 that she had proof of the drug screens in her car, which had been impounded, and she would provide such proof if given time. As of the second TPR hearing date in February of 2024, Mother had not provided any proof of drug screens performed as part of Mother's probation.
[5] Mother tested positive for amphetamines in her urine on June 27, 2021, the date of L.S.S.'s birth.

14

(1) Emotional ties to [Mother];

(2) The extent to which [Mother] has maintained regular visitation or other contact with the child[ren];

(3) The extent of payment by [Mother] for the cost of care and maintenance of the child[ren] when financially able to do so including the time that the child[ren are] in the custody of the division . . .;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child[ren] to [Mother] within an ascertainable period of time;

(5) [Mother]'s disinterest in or lack of commitment to the child[ren];

(6) The conviction of [Mother] of a felony offense that the court finds is of such a nature that the child[ren] will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;

(7) Deliberate acts of [Mother] or acts of another which [Mother] knew or should have known that subjects the child[ren] to a substantial risk of physical or mental harm.

Determining a child's best interests is a "subjective assessment based on the totality of the circumstances." A.O.B., 666 S.W.3d at 305 (quoting Interest of D.L.P., 638 S.W.3d 82, 89 (Mo. App. E.D. 2021)). "There is no requirement, statutory or otherwise, that all seven factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination." Id. (quoting Interest of A.M.W., 652 S.W.3d 225, 244 (Mo. App. W.D. 2022)) (internal quotation omitted).

The trial court found the children have no emotional ties to Mother, based on the lack of visitation as well as Case Manager's testimony and the children's GAL's testimony that the children were not bonded to Mother. Mother acknowledged she did not maintain regular visitation with the children, and she did not take action to complete drug screens or

15

contact One Hope United in order to schedule visits. Mother testified that her wages were garnished in the amount of $60 per month when she was employed, and there was evidence that she sent some gifts to the children, but Case Manager and the GAL both testified these did not contribute significantly to the cost of care and maintenance for the children. Both Case Manager and the GAL believed additional services would not bring about reunification because Mother had not participated consistently or at all in the various services offered. These actions demonstrated a disinterest or lack of commitment to the children and to doing what was needed to bring about reunification, including both taking advantage of services provided as well as obtaining stable housing and employment. There was no evidence that Mother was convicted of a felony offense resulting in a lack of ability to provide a stable home. Finally, the court found that Mother's actions created a substantial risk of physical or emotional harm both through her failure to establish and maintain a relationship with the children as well as her ongoing contact with Father, who, as recently as one month before the first TPR hearing date, had thrown Mother from a moving vehicle.

Mother argues her testimony that she loved her children and wanted to be reunified, that she would be able to complete services if given more time, and that she planned no future contact with Father, render the trial court's best-interests findings an abuse of discretion. However, even given Mother's current, if irregular, substance abuse treatment, and even if Mother never sees Father again, we cannot say the trial court's finding of best interests was an abuse of discretion in light of the ample evidence of Mother's lack of bond with the children and lack of follow-through with offered treatment and therapy, even in the nearly six-month time span between the two TPR hearing dates. Point IV is denied.

16

## Conclusion

For the foregoing reasons, the judgments of the trial court terminating Mother's parental rights to L.M.S. and L.S.S. are affirmed.

_____
Gary M. Gaertner, Jr., J.

Philip M. Hess, P.J., and
Renee D. Hardin-Tammons, J., concur.